Thorburn **KENNEDY, Trustee, Edward M. Swartz and Frederic A. Swartz, Plaintiffs,**

v.

**JOSEPHTHAL & CO., INCORPORATED, Defendant and Third-Party Plaintiff,**

v.

**NRG COAL ASSOCIATES 1979–II, et al., Third-Party Defendants.**

Civ. A. No. 82–913–MA.

United States District Court,
D. Massachusetts.

Sept. 11, 1985.

Thomas H. Tucker, Boston, Mass., for plaintiffs.

Gerald H. Abrams, Newton, Mass., Harold Baer, Jr. and Alan Raylesberg, Guggenheimer & Untermyer, New York City, for defendant and third-party plaintiffs.

Eliot Lobel, Boston, Mass., Edward Ellers, Klehr, Harrison, Harvey, Branzburg, Ellers & Weir, Philadelphia, Pa., Michael A. Collora, Hemenway & Barnes, John J. Curtin, Bingham, Dana & Gould, Boston, Mass., for third-party defendants.

## MEMORANDUM AND ORDER

MAZZONE, District Judge.

This matter is before the Court on the defendant Josephthal's motion for summary judgment. I have addressed earlier aspects of this case on three occasions, and have issued memoranda and orders on June 29, 1982, May 9, 1983 and January 23, 1984. Those memoranda provide the background of this case and I will not repeat it here. Essentially, the plaintiffs, Edward M. Swartz and Frederick Swartz, invested $200,000 to purchase 2½ units in a limited partnership interest known as NRG Coal Associates 1979–II (NRG). The plaintiffs contributed $20,000 in cash and signed promissory notes for $180,000 to begin their investment. They made their investment through Josephthal, the placement agent. In this Rule 10b-5 and state law action, they allege fraud. They claim they were induced to make their investment as the result of (1) oral misrepresentations made to them by Neal Sinclair, a Josephthal employee, (2) written misrepresentation contained in the NRG Confidential Offering Memorandum, and (3) certain omissions which Josephthal failed to disclose.

Extensive discovery has taken place. The depositions of every Josephthal officer and employee with knowledge of the case has been taken. Depositions of various third-party defendants, non-party witnesses and the plaintiffs themselves have taken place. There has been extensive interrogatory responses and documents produced by the direct parties as well as the third-party defendants. Discovery is now complete.

The standard for summary judgment is a high one. A party is entitled to summary judgment where there is no genuine issue as to any material fact. Fed.R.Civ.P. 56(c). *See Hahn v. Sargent,* 523 F.2d 461, 464 (1st Cir.1975), *cert. denied,* 425 U.S. 904, 96 S.Ct. 1495, 47 L.Ed.2d 754 (1976). One purpose of the rule is to pierce the pleadings and assess the proof in order to see whether there is a genuine need for trial.

■ In this Rule 10b–5 claim, the plaintiffs must prove that, in connection with the purchase of a security the defendant, with scienter, falsely represented or omitted to disclose a material fact upon which the plaintiff justifiably relied. *Holmes v. Bateson,* 583 F.2d 542, 551 (1st Cir.1978). These elements are essentially the same for the plaintiffs' common law fraud claim. *Barrett Associates, Inc. v. Aronson,* 346 Mass. 150, 190 N.E.2d 867, 868 (1963). Failure to prove any one of these elements by a preponderance of the evidence mandates a judgment for the defendant.

The defendant's motion focuses on one element, namely, justifiable reliance. For the purposes of this motion, it must be assumed that Sinclair did make the allegedly false statements attributed to him by the plaintiffs. In the context of this case, then, the plaintiffs must show that, in buying these securities, they relied upon the false statements of Sinclair or on the false statements and/or misleading omissions of the Confidential Offering Memorandum; that they were justified in relying on them; and that it was reasonable for them to rely on them. The question is: could a reasonable trier of fact conclude that it was more likely than not the plaintiffs reasonably relied on those statements or omissions. *Zobrist v. Coal-X, Inc.,* 708 F.2d 1511 (10th Cir.1983); *Cook v. Avien, Inc.,* 573 F.2d 685 (1st Cir.1978).

■ After a review of the voluminous record, I must conclude that a reasonable fact finder could not conclude that the plaintiffs reasonably relied on the alleged misrepresentations and omissions. Even if a fact finder were to accept the plaintiffs' version of the facts, namely, that Sinclair made every one of the false statements attributed to him, reliance was not justifiable because the plaintiffs have admitted that they received information and warnings in clear, unambiguous language in the Confidential Offering Memorandum that directly contradicted every assertion they now make.

The analysis must start with a background of certain facts not subject to any reasonable dispute. The fact finder would see the plaintiffs are brothers and are very capable, very astute attorneys with a national reputation. Both have accumulated a very substantial net worth and are large income earners, placing them in the highest taxpayers bracket. They had a long-standing relationship with their broker at Josephthal, Kenneth Zalcman, and had access to information from him, at least. The record does not portray Zalcman as playing a major role in this case. Despite the close relationship with Zalcman, the plaintiffs chose to accept the statements of Sinclair made over the course of several conversations. As attorneys, the plaintiffs were aware of the responsibilities and duties of fiduciaries. The plaintiffs had ample opportunity to detect the fraud, not only by personal inquiry, but by reading the material furnished to them. This aspect is covered in my prior memoranda and orders dealing with the statute of limitations. The misrepresentations were clear and specific; they were not mere puffing or vague allusions to future profitability. As specific statements, they were subject easily to verification or refutation. The plaintiffs were not neophytes or unsophisticated investors. Rather, both had prior, substan-

tial investment experience. Both stated they understood the high risk of this investment, had evaluated it, and could afford to lose their investment. Both understood that even the tax benefit expected from the investment was subject to question.

Turning to the Confidential Offering Memorandum, it is replete with warnings. First, it states the following:

NO PERSON OTHER THAN THE GENERAL PARTNER IS AUTHORIZED TO GIVE ANY INFORMATION WITH RESPECT TO THE PARTNERSHIP AND ITS PROPOSED OPERATIONS NOT CONTAINED IN THIS MEMORANDUM. ANY INFORMATION NOT CONTAINED HEREIN NOR GIVEN BY THE GENERAL PARTNER MUST NOT BE RELIED ON AS HAVING BEEN AUTHORIZED BY THE PARTNERSHIP OR THE GENERAL PARTNER.

It continues with a warning that the offering involves a high degree of risk. Beginning on page 10, the specific risk factors are set out, preceded by the following legend:

RISK FACTORS
INVESTMENT IN THE PARTNERSHIP INVOLVES A HIGH DEGREE OF RISK. THEREFORE IT IS SUITABLE ONLY FOR THOSE PERSONS HAVING A CONTINUING HIGH AMOUNT OF ANNUAL INCOME AND A SUBSTANTIAL NET WORTH WHO CAN AFFORD TO BEAR SUCH RISKS AND HAVE NO NEED FOR LIQUIDITY FROM THEIR INVESTMENTS. EACH PROSPECTIVE INVESTOR SHOULD CONSIDER CAREFULLY THE RISK FACTORS ATTENDANT TO THE PURCHASE OF UNITS, INCLUDING, BUT NOT LIMITED TO, THOSE DISCUSSED BELOW, AND SHOULD CONSULT HIS OWN LEGAL, TAX AND FINANCIAL ADVISORS WITH RESPECT THERETO.

From that point on, the memorandum contains numerous and detailed warnings. In summary, the coal risk factors deal with the existence, quality, processing, and marketability of coal. They reveal the Contract Miner is a newly formed corporation without operating history. Again, there is no dispute that the plaintiffs received the offering memorandum and executed the Offeree Questionnaire and Subscription Agreement indicating that they clearly understood the risks involved, risks they now say, were negated by Sinclair's oral misrepresentation.

A practical way to demonstrate the contradictions are to place them in a trial setting. The fact finder would be asked to compare each of the plaintiffs' allegations with the pertinent portions of the undisputed record.

The trier of fact would be able to find that Sinclair made the following representations:

(1) that contracts for the sale of coal by the partnership were "in the mill" or words to that effect;

(2) that the partnership was ready to start producing coal;

(3) that this was a "safe investment with a lot of protection" or words to that effect;

(4) that the partnership would be profitable even at the then existing price of coal;

(5) that defendant Josephthal had fully investigated the proposed venture and determined it to be bonafide;

(6) that NRG Coal Corp. and Robert L. Goldberg had an excellent track record and the investors in their limited partnership programs had never experienced a call on their letters of credit; and

(7) that defendant Josephthal would monitor the progress of the venture on behalf of the investors.

Each of these allegations is specifically and undisputably refuted by the record as follows:

. . . .

(1) There are no contracts or arrangements for long or short term commitments for the sale of coal". . . .

Offering Memorandum at 12.

. . . .

(2) There is presently no usable mine opening on the Property into the coal seams underlying the Property. The Partnership intends to develop one deep mine on the Property.

Offering Memorandum at 14.

*Existence of Coal*

Although the Engineering Report attached hereto as Exhibit H indicates the existence of substantial recoverable coal reserves in the Property based upon historical and geological data, field inspection, core drilling, gas well logs, exploratory prospecting, and other factors, there is no assurance that such coal reserves in fact exist, that such reserves are in such quantities, or that such reserves are physically or economically recoverable. The General Partner does not intend to conduct any further engineering or testing of the Property or the coal thereon prior to the termination of the offering. Although the Sublessor has agreed in the Sublease to make other properties available to the Partnership in the event the Property does not contain 1,020,000 tons of mineable and merchantable coal with sufficient reserves so that there will be a total of 1,020,000 tons of mineable and merchantable coal available to the Partnership, there can be no assurance that the Partnership will have sufficient resources to develop and mine such additional property. Furthermore, the Sublessor has not set aside nor made any arrangements to ensure its financial ability to provide any specific acreage or leases from which coal would be available to meet this undertaking.

Offering Memorandum at 10.

(3) In addition to the legend set out above, the Offering Memorandum at iii states:

THE ESTIMATES AND PRO FORMA FINANCIAL ANALYSES CONTAINED IN THIS MEMORANDUM ARE PREPARED ON THE BASIS OF ASSUMPTIONS AND HYPOTHESES WHICH ARE BASED ON PRESENT TAX LAW AND CURRENT INTERPRETATIONS THEREOF, ESTIMATES OF COAL RESERVES AND CURRENT JUDGMENTS OF FUTURE ECONOMIC CONDITIONS RELATED TO THE COAL INDUSTRY. THEY ARE SUBJECT TO SUBSTANTIAL RISKS AND CONTINGENCIES COVERING AN EXTENDED PERIOD OF TIME. NO ASSURANCE CAN BE GIVEN THAT ANY OF THE POTENTIAL BENEFITS DESCRIBED IN THIS MEMORANDUM WILL PROVE TO BE AVAILABLE.

. . . .

(4) In the event that the price at which the Partnership is able to sell its coal is not in excess of the sum of its mining costs, taxes, royalties, fees, and other obligations and costs, the Partnership may be unable to meet all of its obligations and may determine to suspend mining operations. In such event or in the event the Contract Miner suspends mining operations pursuant to the Mining Contract, the Partnership runs the risk that it may have to forfeit its interest in the Property and, thus lose its entire investment and incur adverse tax consequences. The Partnership may also be adversely affected by variations in the quality of the coal which is mined, causing it to be unable to meet the specifications of any prospective buyer of the coal or resulting in a reduction in the selling price of the coal below profitable levels. The Partnership will be responsible for the sale and marketing of all coal mined. There are no contracts or arrangements for long or short term commitments for the sale of the coal. No assurance can be given as to the number of purchasers of the coal that may be available in the future or as to prices obtainable, nor can assurance be given that the coal will be saleable in the spot market or on a long-term contract basis or of the prices actually obtainable when sold.

The General Partner of the Partnership is the general partner of a partnership mining coal on a tract adjacent to the Property. There can be no assurance that coal mined from such tract will not result in an unfavorable competitive situ-

ation for the marketing of the Partnership's coal. (See "Conflicts of Interest").
Offering Memorandum at 12.

The Partnership intends to market the coal either as metallurgical or as steam coal depending on market conditions. The General Partner expects to suspend mining operations if the average selling price for the Partnership's coal is so low that mining operations could not be conducted profitably. . . .
Offering Memorandum at 11.

(5) There is no factual support to support this allegation in the record.

(6) *Lack of Mining Experience*

The General Partner has had no experience in the actual operation of a coal mining business and only limited experience in the structuring of coal mining offerings. Its sole share-holder has been primarily responsible for prior coal mining offerings and for the actual operation of coal mines. (See "Past Activities" and Exhibit M—"Background and Experience of the General Partner.")

The Partnership will be substantially dependent upon the management, employees and financial resources of the Contract Miner for its economic success. The Partnership will engage an independent Consultant to supervise the activities of the Contract Miner and to render advice concerning marketing of coal. (See "Proposed Mining Activities—The Consultant.")

In addition, the Contract Miner is a West Virginia corporation formed in 1979 with no experience in the coal mining business, no assets and no employees. Its principals, while relatively new to the coal mining business, have four years of experience in the operation of coal mines through another corporation with which they are affiliated as principals. The Contract Miner will be dependent upon his corporation's experience for the success of its operations.
Offering Memorandum at 17.

(7) The plaintiff, Edward Swartz, admitted at his deposition there was no basis for the allegation.

An analysis of the alleged written representations would present a similar picture. Those allegations contained in Paragraph 12 of the plaintiffs' complaint deal with the intent to mine coal, the cash flow, the production royalties, working capital, the quantity and marketability of coal and the services to be performed by the accountant.

Again, every allegation is either effectively and uncontrovertedly refuted by the record, or the allegation itself is baseless. Reading the Confidential Offering Memorandum as a whole, and isolated portions of it, the memorandum is replete with warnings that:

(1) An investor would be required to pay principal and interest if no cash flow were available (page 4).

(2) Cash portion would be due and payable if Production Royalties do not equal the cash portion (page 6).

(3) The partnership may require additional working capital (page 19).

(4) There is no assurance coal exists or is economically recoverable (page 10).

(5) Market prices are low and similar mining operations have been economically unprofitable (page 12).

There is also no factual support that Josephthal knew that NRG never intended to mine coal. On the contrary, the Offering Memorandum clearly discloses that no coal had been mined, that profitability was in question, that the investor faced a high risk proposition, that the contract miner had no operating history and had no assets and no employees.

There is no dispute that all units were sold so that the funds were not to be returned to the investors. Nor is there any dispute that the certified public accountant was engaged, even if this were considered a material matter.

Finally, a similar review can be made as to the alleged omissions. Even if reliance were not needed, *see Affiliated Ute Citizens v. United States*, 406 U.S. 128, 92 S.Ct. 1456, 31 L.Ed.2d 741 (1972), the allegations of material omissions were specifi-

cally addressed and disclosed in the memorandum and its attachments, again, reading the material in its entirety and not selectively.

In summary, the plaintiffs cannot persuade any reasonable fact finder on the record presented here that they reasonably relied on the alleged oral misrepresentations, the alleged written misrepresentations, or the alleged omissions. Therefore, the defendant is entitled to summary judgment on the Rule 10b–5 claim, the common law claim, and the claim under Section 410 of the Massachusetts Securities Act, M.G.L. c. 110A § 410. The remaining two claims of the plaintiffs' complaint can be dealt with briefly.

The plaintiffs claim that Josephthal sold unregistered limited partnership interests in violation of M.G.L. c. 110A §§ 410(a) and (b). However, an exemption from registration is provided in Section 402(b)(9) of the Massachusetts Securities Act and there is no dispute that an exemption was sought and that Josephthal met the requirements for exemption. That claim must also be dismissed.

The final claim is brought pursuant to the Massachusetts Consumer Protection Act, M.G.L. c. 93A. The recent decision of the Supreme Judicial Court in *Cabot Corp. v. Baddour*, 394 Mass. 720, 477 N.E.2d 399 (1985) disposes of this claim. Chapter 93A does not apply to securities transactions as alleged in this complaint.

■ On this record, I am satisfied that there is no factual question as to the issue of reasonable reliance, an essential element of the plaintiffs' basic claims, nor as to the exemption of these interests from registration under Massachusetts law. As the record amply disclosed, my factual analysis could continue indefinitely. The defendants have submitted over 100 pages of memoranda and the plaintiffs over 58 pages. Each side has supported its position with an extensive record of documents, affidavits and excerpts from the pleadings. While I am mindful that summary judgment is not to be a trial by affidavit, this record demonstrates that the plaintiffs in no way relied upon Sinclair's misrepresentations and non-disclosure of material facts.

To counter this impressive record, the plaintiffs are asking for the opportunity to persuade a fact finder that they lacked the ability to understand the Offering Memorandum, the offeree questionnaires, and the subscription agreements. They, in effect, would tell the fact finder they lacked the financial acumen to determine their own best interests and would say that they did not read the material, that the "boilerplate" agreements were "whisked" in front of them for their signatures. While I am aware that reliance is generally an issue of fact, the plaintiffs have not produced the record to controvert the defendant's position and thus defeat the motion for summary judgment. The plaintiffs must accept the consequence of their failure to use due diligence.

■ Rule 10b–5 is not insurance against an investment loss. The policy underlying the Rule is full and fair disclosure. This record shows the purpose of the material provided to the plaintiffs was to advise them of the investment, not influence their decision to invest. If the investment were attractive at all, its attractiveness would lie in the small amount of cash involved and the tax benefit to be realized.

■ In accordance with the foregoing, the defendant's motion for summary judgment is allowed and the complaint is to be dismissed.[1]

SO ORDERED.

---

1. The plaintiffs have filed a motion for leave to amend their complaint pursuant to Fed.R.Civ.P. 15(a). That motion comes after my earlier three memoranda and while I have the defendant's motion for summary judgment under advisement.

An amendment at this time would be unfair to the defendant and third-party defendants. After protracted discovery, the accumulation of an expensive and extensive record, numerous conferences and the development of clear issues set out in the summary judgment motion, these new factual allegations would require discovery

be opened by all parties and a further round of
third-party complaints and more cross-motions
among the defending parties. I also note that
the same third-party defendants in this action
are direct defendants in another lawsuit pend-
ing in this Court.

At the same time, the threshold issue remains:
was there reasonable and justifiable reliance by
the plaintiffs.

The proposed complaint adds 9 more alleged
oral misrepresentations, 40 more written mis-
representations, and 4 more omissions. They
add no newly discovered evidence or facts of a
different character to justify an amendment.
The plaintiffs have merely re-scrutinized the
record with a fine tooth comb and have culled
from the record every statement which would
conceivably be the subject of a dispute and/or
charge Sinclair made a false statement with
regard to it. Such a tactic merely invites a
response similar to the present motion. Accord-
ingly, I have denied the motion for leave to
amend. *Tiernan v. Blyth, Eastman, Dillon &
Co.,* 719 F.2d 1, 4–5 (1st Cir.1983).