**John F. XAPHES, Plaintiff,**

v.

**MERRILL LYNCH, PIERCE, FENNER & SMITH, INC., Tucker Anthony & R.L. Day, Inc., and Mark B. Billings, Defendants.**

**Civ. No. 80–0132–P.**

United States District Court,
D. Maine.

April 2, 1986.

John J. O'Leary, Jr., Jeffrey D. Curtis, Portland, Me., for plaintiff.

Thomas H. Allen, Portland, Me., for Merrill Lynch.

James E. McGuire, Boston, Mass., for Tucker Anthony.

Thomas Wheatley, Thomas Schulten, Portland, Me., for Billings.

## OPINION

GENE CARTER, District Judge.

### I. *Findings of Facts*

In this action Plaintiff seeks to recover damages from Defendants under various

provisions of the securities laws of the United States and the common law. Specifically, Plaintiff alleges that his stockbrokers, Defendant Billings and nonparty Ronald Stephens, engaged in unsuitable and excessive trading of Plaintiff's accounts at Merrill Lynch and Tucker Anthony and that they also made material misrepresentations and omissions in connection with Plaintiff's purchase and sale of securities.

The events which give rise to this case began in 1954 when Plaintiff's father died, leaving to Plaintiff, then a law student, stocks and bonds worth approximately $112,000. Plaintiff graduated from law school in 1956 and was admitted to the bar in 1957. From that time until October 1979, he conducted a small, unprofitable law practice in Biddeford. He supported himself entirely from the dividends and interest on the stock he had inherited from his father. In the period 1957 to 1971 Plaintiff was politically active, running unsuccessfully for public office several times on the Republican ticket. In 1961 Plaintiff was appointed Treasurer of the City of Biddeford, and he served in that part-time position for two years at a salary of $1500 per year. Mr. Xaphes' principal duties as city treasurer were to supervise collection and disbursement of money by the different city departments and to sign for city loans.

Plaintiff lived with his mother in the family homestead in Biddeford until her death in 1971. When she died, she left Plaintiff stocks which she had inherited from her husband, an office building on Graham Street in Biddeford, and a one-half interest, as a tenant in common with his brother, in the family summer house on the ocean at Pine Point in Scarborough, Maine. Plaintiff also inherited one-half of his mother's one-third joint interest in a condominium in Fort Lauderdale, Florida, in which he and his brother already owned the other two-thirds interest. Shortly after his mother's death, Plaintiff, with his brother, bought a house on a lot abutting their property at Pine Point.

Plaintiff also married in 1971. Although Mrs. Xaphes worked until late 1977, her earnings were placed in savings, and Plaintiff supported himself and his wife on the dividends and interest from his inherited portfolio. He and his wife lived at Pine Point in the summer, in Florida in the winter, and in the family home in Biddeford, then owned by Plaintiff's brother, in the spring and fall.

Prior to 1976 Plaintiff did not trade his stocks and he had no stockbroker. He kept all his stock certificates in a safe in the cellar of the family home in Biddeford. Plaintiff regarded his stock as an heirloom, and he testified that he intended to keep the portfolio intact because he was emotionally attached to his stocks and because they were a good source of income. Moreover, sale of the stocks would result in his payment of high capital gains taxes. By June 1976 Plaintiff's stock had appreciated in value to approximately $525,000.

While in Florida in 1976, Plaintiff heard about options trading from his brother and as a result went to Merrill Lynch's Fort Lauderdale office. He met there with his brother's broker, Ben Doyal, in April 1976. Doyal explained options to Plaintiff, who at that time signed a Merrill Lynch standard option agreement and filled out a Merrill Lynch option information form (1014). On the form that Plaintiff filled out, he indicated that the value of his portfolio was $525,000, a figure that was accurate to within a few hundred dollars. This indicates to the Court, without doubt, that Plaintiff followed stock prices and could price out his portfolio. Doyal also gave Plaintiff a copy of the Options Clearing Corporation (OCC) prospectus, which described the risks of option trading.[1] Al-

---

1. In fact, the front of the prospectus stated in bold face type:

Both the purchase and writing of Options involve a high degree of risk and are not suitable for many investors. Such transac-tions should be entered into only by investors who have read and understand this prospectus and, in particular, who understand the nature and extent of their rights and obligations and are aware of the risks involved.

though Plaintiff wanted to use Doyal as his broker for trading options, when Doyal learned that Plaintiff was from Maine he suggested that he open his account at Merrill Lynch in Portland.

Following Doyal's advice, Plaintiff went to Merrill Lynch in Portland on June 10, 1976. There he met Defendant Mark Billings, a Merrill Lynch registered representative. Knowing that options trading requires the deposit of stock certificates, Plaintiff had brought some with him, and he told Billings that he wanted to write options. Plaintiff chatted with Billings about his financial status, mentioning his real estate holdings and stating that he had a "substantial" portfolio, valued at slightly less than half a million dollars. Plaintiff told Billings that he was a part-time lawyer who spent winters in Florida. He also told Billings that he wanted to write options to increase the income from his portfolio, but did not want to sell his heirloom portfolio. Billings gave Plaintiff another copy of the then current OCC prospectus and told him to read it. Indeed, Plaintiff's cross-examination makes it clear that he did read the prospectus. During that first meeting, while discussing some of the risks of options trading, Billings told Plaintiff that he could write covered options against his portfolio without great risk of selling the stocks because he could buy back an option if it appeared that the option would be exercised.

Billings did not ask Plaintiff direct questions about his income and other financial means. After the meeting, however, without having obtained specific financial information, Billings filled out a new account form for Xaphes. That form included various pieces of inaccurate information such as that Plaintiff's approximate annual salary was $75,000 and that his net worth was approximately $3,000,000. In fact, Plaintiff had no salary but had an annual income of about $23,000 from his investments. His net worth was $671,000, exclusive of equity in his home. Billings also stated on the new account form that Plaintiff had been dealing with Merrill Lynch in Florida for five years. That assessment was incorrect; Xaphes had visited Ben Doyal once, a year previously, to sell a warrant and then again in April of 1976 when he inquired about options trading. Without verifying what he testified were just random guesses based on his conversation with Plaintiff, Billings submitted the new account form to David Mowry, the branch manager, for approval.

Merrill Lynch policy required that customers wishing to trade options sign a standard option agreement. Such an agreement was not signed until July 20, 1976, after Plaintiff's account had already begun trading options. Also, although Merrill Lynch policy required filing and managerial approval of an options information form (1014) in order to open an options account, Billings did not file that form until almost a year later. Mowry approved the opening of Plaintiff's options account based solely on the inaccurate information provided by Billings and without the required form. The opening of Plaintiff's account was accomplished, therefore, in violation of express Merrill Lynch policy concerning determinations of suitability. The testimony at trial made it clear, however, that Plaintiff was, in fact, suitable for options trading and would, without doubt, have been approved for opening an options trading account if the true information concerning his financial status and experience as of June 1976 had been presented to the approving authorities.[2]

An investor should not purchase an Option unless he is able to sustain a total loss of the premium and transactions costs of purchasing the Option, and should not write an Option unless he either owns the underlying security or is able to sustain substantial financial losses. Risks of Options transactions are discussed throughout this prospectus....

Ex. 24 p. 1. The prospectus clearly spells out the fact that the writer of a call option has "no control over when he may be required to sell his securities." Ex. 24 at 20. The prospectus also demonstrates that the risks of loss are even greater if one has to go out and buy securities on margin to deliver upon exercise. The high risks of "spreads" are also discussed.

2. *See* testimony of Richard Lewis, November 6, 1984, at 307–08, 446–51; Timothy Barnes, No-

Plaintiff signed a margin agreement on July 6, 1976, allowing him to borrow money from Merrill Lynch to buy stock. He did not begin buying on margin at that time, however. Billings had told Plaintiff that for the sake of greater safety to his heirloom stock, Plaintiff might want to be able to buy stock on margin in case of exercise of outstanding calls. It is clear that Plaintiff understood and was concerned about the risk to his heirloom stock of possible exercise of the options. The Court is satisfied from the cross-examination of Plaintiff that he knew, before any stock was bought on margin in late September 1976, that he was pledging his stock as collateral for the debt accrued on margin and that it was possible that his margin stock might decline in value or become worthless, threatening his account's collateral. Plaintiff also knew that he would have to pay interest on his debit balance for as long as the loan was outstanding.

During the summer of 1976 Plaintiff wrote covered calls on seven securities in his portfolio. Except for one, those transactions were profitable. In late September 1976 Plaintiff wanted to make his portfolio work harder, so he adopted a "buy-write strategy," proposed by Billings. This plan entailed writing options on six issues of "blue chip" stock, bought on margin [3] for approximately $69,000, and was to run from September 30, 1976 to April 1977, at which time the options would expire. In a work sheet, Billings projected for Plaintiff the profits to be gained if the market (and margin stock prices) rose and the stock was exercised away from Plaintiff. These profits did not materialize because five of the six stocks purchased on margin did not increase in value and the options were not exercised. Plaintiff decided, with Billings' advice, to hold on to the margin stocks until he could break even or make a profit on them.

From the time he opened his account at Merrill Lynch, Plaintiff remained in close contact with Billings, either by phone or in person. In these conversations Billings discussed with Plaintiff the prices of stocks and options he was proposing that Plaintiff buy and the prospects that various stocks would go up or down. Plaintiff also received and understood confirmation slips sent to him after each transaction in his account and could match opening and closing transactions.[4] He received monthly statements from his brokerage house showing transactions in his account and his debit balance. He reviewed these at his office and filed them. He reviewed some of the statements with Billings. Plaintiff was able to distinguish between the margin stocks and heirloom stocks listed on the statement and he made notes on some of the statements concerning payment of the interest debt.

Plaintiff was a meticulous record keeper who kept a diary in which he recorded visits and discussions with his brokers. He also kept detailed records of expenses related to his options trading. These records were then passed on to his accountants to document deductions taken in connection with his investment business. Some of the items which Mr. Xaphes deducted included telephone calls to his broker, mileage and parking expenses for trips to visit his broker, and expenses for books, magazines and newspapers such as *The Wall Street Journal, Options Alert* and *More Money With Stock Options*. Plaintiff could and did calculate the profits and losses in his account, and sent an accurate statement of them to his accountants for 1976.

In May 1977, realizing that there was no options information form for Plaintiff, Bill-

vember 27, 1984, at 115, 117–19, November 28, at 86–87; David Mowry, November 9, 1984, at 809–13; Mark Billings, November 16, 1984, at 114–15, 117; Ronald Stephens, November 29, 1984, at 134; Jory Berkwits, November 13, 1984, at 897–99.

**3.** In documents Plaintiff referred to his margin account as his "aggressive account."

**4.** The confirmation slips showed the name of the security, the type of option, the number of contracts, the price, the broker's commission and the net debit or credit to Plaintiff's account.

ings sent a form to Plaintiff asking him to sign it. Plaintiff signed it in blank and returned it. Billings then filled it in and had it approved by Mowry. Again, on this form Billings supplied inaccurate information concerning Plaintiff's financial status, stating that Plaintiff had securities worth $1.25 million and $150,000 cash on hand. The form also reported that Plaintiff wished to engage in trades known as "spreads" although at that time Billings had not discussed spreads with Plaintiff. On approving the form, David Mowry, the Merrill Lynch manager backdated the form to July 1976, saying that the previous form had been lost, although that was not the case.

During the period from July 1977 to July 1978 Plaintiff acquired a significant debit balance while engaged in two new, different options strategies: the writing of "straddles" and "spreads."[5] Billings discussed the strategies with Xaphes, who testified that at the time he understood them. Xaphes agreed to the plan and it went forward. For the straddles, the account bought, on margin, stocks on which Merrill Lynch had a good fundamental research opinion. No formal approval was given by the Merrill Lynch management for the writing of straddles.

In September 1976 and again in September 1977 Plaintiff received an "audit statement" from Merrill Lynch requesting that he confirm to Merrill Lynch's auditor that the monthly statement agreed with his records. Plaintiff each time confirmed by signing the statement and sending it back to the auditor. In early 1978 Plaintiff calculated the profits in his account for 1977 and reached a figure that agreed, within fifty cents, with the figure Billings arrived at for the same calculation. That figure was some $13,000 less than the amount of money that Billings had sent to Plaintiff over the course of 1977.

At several times in 1977 and 1978 the activity level and commissions generated in Plaintiff's account were high enough to warrant, under Merrill Lynch policy, a monthly activity review. The information submitted by Billings on these forms for these reviews again differed widely from review to review on such matters as Plaintiff's net worth, income, age, number of dependents, and goals. In some instances the commissions generated by the account reached a level requiring a profit and loss statement for the monthly activity review. At least once Billings did not perform the profit and loss statement satisfactorily. In no instance were the results of the review or profit and loss calculations provided to Plaintiff, because Merrill Lynch considered calculation of profits and losses to be the responsibility of the client.

The monthly activity reviews were approved by the Merrill Lynch managers, and because they observed nothing that was unusual about the trading in the account, they never felt any concern about Plaintiff's account sufficient to generate further managerial scrutiny. As one Merrill Lynch manager, Jory Berkwits, put it: "What I am concerned about is whether what he is doing is suitable. Is he making investment sense? Is his strategy going to work for him long term? That's why I approved the account." Berkwits Trial Tr. at 934.

In April 1978 Plaintiff's account sustained significant losses due to an unexpectedly violent rise in the market. The account was heavily written at the time and Plaintiff repurchased all call positions for a $17,000 realized loss.

At Merrill Lynch in the first period, June 1976 to June 1977, Plaintiff paid Merrill

---

**5.** As Billings explained it, the term "straddle" refers to the simultaneous purchase or sale of a put and a call on the same stock, with the same striking price and expiration. In this case the straddles were called margin straddles because the puts and calls were placed on stock bought on margin. A spread, according to Billings, is a simultaneous purchase and sale of two different classes of calls or two different classes of puts in the same underlying security; e.g., the purchase of a long call position and sale of a short call position on the same stock. The OCC prospectus describes a spread position as "one in which an investor is the holder of one or more options of a given class and concurrently maintains a position as a writer of one or more options of different series within that same class." Exhibit 24, at 22.

Lynch commissions of $24,200. Of that amount, $22,590.16 was generated by the 235 trades engaged in between June 30, 1977 and June 26, 1978. For the last year of the first Merrill Lynch period, Plaintiff's account was Billings' largest in terms of commissions, totaling slightly more than one fifth of his noninstitutional commissions. While at Merrill Lynch during the first period, Plaintiff's account sustained a net gain of $7,081.11. Plaintiff's debit balance at the end of the first Merrill Lynch period, as shown on his monthly statement, was $209,760. Part of the debit balance consisted of real estate loans which Plaintiff had taken from or transferred to his account at Merrill Lynch. These totaled slightly over $50,000.

In late June 1978 Mark Billings decided to leave Merrill Lynch and join the firm of Tucker Anthony & R.L. Day, which was to be managed by Richard Lewis, who was also leaving Merrill Lynch. Plaintiff decided to switch to Tucker Anthony as well so that he might keep his account under Billings' supervision.

Tucker Anthony policy required that the branch manager be personally satisfied that each customer understood options transactions before allowing options transactions in the account. Tucker Anthony policy also required a new account form before the account could be opened and an options new account form/options agreement for options customers. The options new account form was to include the broker's comments on appropriateness of options transactions.

No Tucker Anthony new account form for Plaintiff was produced at trial. In June of 1978, one of Tucker Anthony's brokers, P. Jefferson Kimball, brought the options agreement/options new account form to Mr. Xaphes at Pine Point for signature and Xaphes signed it in blank. The preprinted agreement stated that Plaintiff was aware of the special risks of options trading, agreed to maintain sufficient margin, and authorized Tucker Anthony to sell securities held in the account if Plaintiff failed to pay monies due to Tucker Anthony. When

it was returned to him, Billings filled in the form, erroneously stating that Plaintiff was in the 50% tax bracket and that his income was over $50,000. No comments on suitability were included on the form.

Kimball also brought a margin agreement for Plaintiff to sign. At the time, Plaintiff had been trading on margin for almost two years at Merrill Lynch, and he signed the agreement, which disclosed the risks of margin trading, without explanation of it by Kimball.

From his experience at Merrill Lynch, Richard Lewis knew Plaintiff, the extent of his interaction with Billings and, to a limited extent, the nature of his account. Lewis approved Plaintiff's account for purchasing and selling options, spreads and uncovered writing, some of which strategies were considered speculative by Tucker Anthony. When he approved Plaintiff's account, Lewis did not know the source of his income or the fact that Plaintiff supported himself from the dividends on his portfolio, which he did not want to sell. Plaintiff's account was also approved by Timothy Barnes, Director of the Compliance and Legal Department at Tucker Anthony, on the basis of the options new account form. That form did not indicate that the account was a margin account or that Plaintiff did not desire to sell certain of his stocks.

At Tucker Anthony, Plaintiff's account engaged in the same strategies it had at Merrill Lynch. As before, these entailed extensive trading. Billings continued to send money to Plaintiff from his account which Plaintiff deposited in his personal options checking account. Each check was sent only after discussion with Plaintiff and at Plaintiff's request. Some of the checks represented net proceeds in the account and others were drawn from proceeds and corresponded to amounts needed by Plaintiff for personal use. For example, in late July 1978 Plaintiff withdrew approximately $3,700 from this account for home repairs. Shortly thereafter, he withdrew some $14,000 for a new Cadillac. He had bought another new Cadillac with $11,000 from the account early in 1978 and had

used some of the money even earlier for a trip to Germany and for estimated taxes.

In August 1978 Billings invited Plaintiff to a presentation at Tucker Anthony concerning a tax shelter in OMNI Exploration, Inc. Plaintiff decided to invest and used $25,000 from his options checking account for that purpose. In 1978, Plaintiff did not realize any considerable tax savings on his investment. By the end of 1979, however, the price of an OMNI partnership interest had appreciated significantly.

Shortly after he invested in OMNI, Plaintiff asked Billings about borrowing money from Tucker Anthony to buy more real estate from his brother. They discussed the possibilities and Billings told him that if he borrowed the mentioned amount, his account would be strapped. Billings then suggested that Plaintiff borrow from a bank.

In October and November of 1978, the stock market plunged dramatically in what was referred to in the business as the "October massacre." Plaintiff's account sustained more than $60,000 in realized losses in this period.[6] At one point in his testimony, Plaintiff claimed to have known nothing about these losses. The Court does not find this testimony credible, however. Plaintiff's diary shows that he visited Tucker Anthony very frequently during this period. Plaintiff later acknowledged that he received confirmations of the transactions in this period which showed that there were losses. Even though Plaintiff did not know the exact magnitude of the losses, attuned as he was to the stock market, he must have realized that the "massacre" had also ravaged his account.

In February 1979 Billings prepared a summary of Plaintiff's 1978 transactions for Plaintiff's accountants. Plaintiff checked these calculations against his confirmation slips and relayed them to his accountants, along with detailed calculations of his deductions for his investment business. When the accountant prepared

the tax return, it showed options profits of $8,700. Plaintiff testified that he thought he had had $64,000 in profits because this was the amount of money that had been sent to him from his account. He did, however, sign and file his income tax return as prepared. He testified that shortly thereafter he spoke to Billings and mentioned the discrepancy, and Billings told him it was "magic with numbers." Although Plaintiff met with Billings in June and July of 1979, he never bothered to discuss the issue with him.

In June 1979 Billings told Plaintiff that he was rejoining Merrill Lynch in California. Xaphes testified that he was sorry to see Billings leave because he thought he had been a good broker. Plaintiff's account at Tucker Anthony was to be taken over, with Plaintiff's agreement, by Jefferson Kimball. Kimball had known Plaintiff when Kimball was employed at Merrill Lynch and, based on questions Xaphes had asked him and remarks concerning his responses, Kimball had considered him to be a sophisticated investor. At their first meeting, Xaphes told Kimball that he wanted to make sure checks for dividends on the stocks in his account were sent out to him. Xaphes also told Kimball that he wanted him at the end of each month to net out the closing transactions in his account and, if there were net profits, to mail out a check for those, and if there were losses, for Kimball to tell him and he would mail in a check. At that time Plaintiff said that he and Billings had had several different arrangements concerning the sending out of money from the account. Kimball testified that while making that statement, Plaintiff looked over at Billings and they smiled at each other. Plaintiff said, however, that this was how he wanted Kimball to handle the trades. Plaintiff also said he wanted to know what the interest expense was so he could pay for that. Kimball made notes at the meeting of five things Plaintiff told

---

**6.** Plaintiff's losses were offset by various gains on the transactions for a net loss of some $25,000.

him about his account, including the status of specific stocks and loans outstanding.

After becoming Plaintiff's broker, Kimball sent Plaintiff three checks according to the method prescribed by Plaintiff. Kimball also conducted some trades for Plaintiff, the specifics of the transactions having been decided on jointly by Plaintiff and Kimball.

Although Kimball knew early in July that Plaintiff had a sizeable debit balance, he did not discuss it with Plaintiff because he assumed that Plaintiff knew about it. Kimball knew that Plaintiff had been in constant communication with Billings and had been receiving monthly statements. Moreover, his own discussions with Plaintiff, which included the subject of the buying power in the account, gave the impression that Plaintiff knew what was going on in his account. For example, at one point Kimball warned Plaintiff of a risk of premature exercise of a call and recommended buying back the call. He told Plaintiff, however, that the account had little buying power. Plaintiff appeared unsurprised and suggested finding other stocks in the portfolio against which calls could be written to generate the money to buy back the initial calls.

On July 26, Kimball went to Xaphes' home at Pine Point to discuss the account with him. He asked Plaintiff what the components of his debit balance of .$257,-000, shown on his monthly statement, were. Plaintiff asked, "What debit balance?" Appearing very worried, Plaintiff told Kimball that there must be some mistake. Upset, Plaintiff later telephoned Billings in New York to ask what had happened to his account. Billings testified that Plaintiff's questions made no sense to him; he did not answer them, then or ever.

Kimball left Pine Point and undertook to ascertain the components of the debit balance. To this end, Kimball also telephoned Billings. Billings said that Plaintiff is a worrying sort of man and that by confronting him, Kimball had gotten him worried. Billings said the debit balance was made up of Xaphes' loans and stocks bought on mar-

gin. Billings reaffirmed what Xaphes had previously told Kimball about how they had had several different arrangements about how monies were to be sent out and said that "from time to time excuses would be made on the part of Mr. Xaphes and Mr. Xaphes would instruct [Billings] to mail him checks from the account not representing profits or losses.... Maybe in other words a check would be mailed, when, in fact, there was not option profit available, but John had indicated to Mark in one form or another that he needed money." Kimball Trial Tr. at 253–54. At some point, in a telephone conversation, Plaintiff told Kimball that in 1977 he had a $11,000 net profit and that he was paid $48,000, and that in 1978 he had a net profit of $5,800 and was paid $63,000. Plaintiff said that in 1979 approximately $20,000 had been paid. Exhibit 718. Kimball's initial review of the account provided him with only a rough understanding of the debit balance and before he acquired a specific understanding in order to report to Plaintiff, Tucker Anthony's manager sent the materials to the firm's New York audit department for a determination of how the debit balance originated.

When Kimball reported to Timothy Barnes, Tucker Anthony's compliance director, that Plaintiff did not seem to understand what was going on in his account, Barnes spoke directly with Plaintiff. Barnes was concerned that Plaintiff was confused about his debit balance and that so much of the equity in his account was made up of securities that Plaintiff did not wish to sell. Barnes told Plaintiff that until his concerns had been resolved that Tucker Anthony would enter no more opening transactions for him.

At that time Plaintiff transferred his account back to Merrill Lynch. During the thirteen months his account was at Tucker Anthony, it engaged in 186 transactions, which generated commissions of $33,133. Over the same period, the account sustained a net loss of $38,509.88, and the debit balance on August 16, 1979 was $229,528.58.

Billings had told Merrill Lynch broker Ronald Stephens that he was leaving the account and Stephens had contacted Xaphes. At their first meeting Stephens learned that Plaintiff was a lawyer, but that he derived his income from his securities rather than from the practice of law. Stephens learned of Plaintiff's real estate holdings and lack of appreciable cash on hand. Plaintiff told Stephens that he did not understand where the debit balance had come from and that he had had an arrangement whereby Billings was to send him profits as they were made and dividends on a regular basis. Plaintiff had made notes showing the discrepancy between what he was sent and profits reported on his income tax return. Plaintiff told Stephens that Billings had explained the difference between these figures as "magic with numbers."

Stephens offered to draw up a plan for Plaintiff, and he and Merrill Lynch's manager, Berkwits, proposed several alternative courses of action to eliminate the debit balance: (1) sell off some of the portfolio; (2) sell or rent some of the real estate; (3) write options conservatively in the manner he had been in order to generate income to keep current on the interest debt and pay down the debit balance. Plaintiff rejected the first two strategies and decided to continue with the investment course he had been pursuing. Stephens suggested restructuring the portfolio somewhat by selling some of the heirloom stocks and replacing them with higher yield stocks which were optionable. At first Plaintiff rejected this approach, but later decided to follow it.

Plaintiff's account was reactivated both for margin and options trading based in part on the fact that it had previously been opened for these purposes at Merrill Lynch. At the time the account was reactivated, on August 16, 1979, Berkwits, who was responsible for such approval, knew the status of Xaphes' account and other details concerning his financial situation.

Plaintiff was told that the strategy he had chosen might take six to seven years to eliminate the debit balance and that there was always the possibility that the options would be exercised and he would lose his heirloom stock. Plaintiff knew these things and chose the strategy anyway. Plaintiff remained in close contact with Stephens during the second Merrill Lynch period, sometimes phoning the office more than once a day and sometimes visiting the office once or twice a week. Conversations between them dealt with profits and losses, realized and unrealized; the debit balance and equity; the market value of the account; and the status of Plaintiff's options. Occasionally Plaintiff suggested transactions in the account, and he and Stephens discussed all the transactions that were undertaken and the attendant risks.

During the second Merrill Lynch period, Plaintiff paid commissions of $19,394. He sustained a net loss of $2,947.68. His debit balance as of May 13, 1980 was $214,357.80.

The foregoing chronological account generally states the facts as found by the Court. To the extent that additional factual findings are necessary to the resolution of the legal issues posed, they will be set out in conjunction with discussion of those issues.

## II. *Claim of Unsuitable Trading*

Plaintiff first alleges that Defendant Billings violated section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b) and its implementing rule, 10b–5, 17 C.F.R. § 240.10, by recommending investments to Plaintiff which were unsuitable for him. Plaintiff suggests specifically that the investments posed too much risk to his heirloom stock, which he did not wish to sell and upon which he depended for his income.

Plaintiff also asserts that the unsuitable trading was caused in part by Defendant's failure to comply with the stock exchange's "know your customer" rules and the brokerage firm's policies designed to comply with those rules. Rule 405 of the New York Stock Exchange and Rule 411 of the American Stock Exchange impose an affirmative duty on stockbrokers to use due diligence to learn essential facts about

their customers.[7] The record clearly reflects poorly on the recordkeeping and review practices of Billings and Merrill Lynch, in the first period, and Tucker Anthony thereafter in Plaintiff's case, as well as casting serious doubt on the effectiveness of the firms' internal discipline. Cast in their best light, Billings' provision of inaccurate information and failure to fill out certain required informational forms were sloppy practice. And, in light of express company policies, the brokerage firms' haphazard review procedures were no better. These failures of procedures, however, were shown at trial to be of no practical import in the case of the Plaintiff in the determination of suitability.[8] The testimony of Richard Lewis, Jory Berkwits, Timothy Barnes, David Mowry and Ron Stephens establishes that if all the accurate information about Plaintiff had been known and properly reviewed, Plaintiff would have been found suitable for a margin account and for all types of options trading at both brokerage houses. Such assessments of suitability, if made, would have been amply supported by the actual facts about Plaintiff's circumstances.

John Xaphes was a highly educated, financially sophisticated investor at all times pertinent to this litigation. Although he had not, prior to 1976, used the services of a stockbroker, he was a lawyer, admitted to practice in the bars of two states, three federal district courts, and six federal courts of appeal. Plaintiff attempts to minimize his professional experience, asserting that he never practiced full time and never made a profit from the practice of law. Plaintiff's training, resumes, membership in multiple bars, and maintenance of an office, together with the fact that he did indeed see and represent clients, all indicate, however, that he was a lawyer who took himself seriously in that regard and expected others to do so.

Although Plaintiff had no specific financial training, he had significant property which he managed himself, and he was twice appointed Biddeford City Treasurer. In the course of his law practice, he was called upon to price stocks in clients' portfolios. Although he professed at trial not to follow the price of stocks in his portfolio, that assertion is not credible. Just prior to coming to Merrill Lynch in Portland in June, 1976, Plaintiff had estimated the value of his large portfolio within $500.00 of its actual value. Moreover, also prior to coming to Merrill Lynch in Portland, Plaintiff had inquired about options at Merrill Lynch in Florida and had been given the OCC Prospectus dealing with option trading to read. Although Plaintiff's testimony was equivocal on the point, the Court finds that he did read the prospectus.

After Plaintiff opened his account at Merrill Lynch, his level of involvement with financial matters and consequent sophistication increased. Billings provided him at the opening of the account with another OCC Prospectus and told him to read it. New prospecti and supplements were routinely provided him as they became available. He was in constant contact with his stockbrokers Billings, Kimball and Stephens. He kept detailed notes on his investments, read (and took tax deductions for) financial publications, watched a stock market television channel and used his confirmation slips to provide detailed instructions to accountants concerning his investments. The Court of Appeals for the First Circuit has noted similar facts as constituting indicia of investor sophistication. *Landry v. Hemphill, Noyes & Co.,* 473 F.2d 365, 373, n. 10 (1st Cir.1973). Plaintiff had the time to and did monitor his investments closely as his detailed records suggest. Thus, although after the first year of trad-

---

7. By order dated September 15, 1983, this Court denied Plaintiff's motion to amend the complaint to include a separate count alleging violation of the stock exchange rules.

8. In *Thompson v. Smith Barney, Harris Upham,* 539 F.Supp. 859 (D.Ga.1982), the Court found

that a stockbroker for defendant had deliberately falsified information on required forms. The Court found no implied right of action under the stock exchange rules and did not find the broker's misdeeds in this respect to be the basis for any other type of securities law violation.

ing the activity in his account represented a considerable level of sophistication, Plaintiff, over time, had achieved a commensurate level of trading knowledgeability and sophistication.

Plaintiff asserts that the investments undertaken by him were not suitable considering his investment goals and financial needs. He did, as he contends, have the goal of not selling his heirloom stocks. If that were his *sole* goal, however, logically he would not have been motivated to take them out of his safe and consult with a stockbroker. He also told Billings that he wanted to earn extra income from his portfolio and specifically stated that he wanted to write options. Timothy Barnes testified and the Court finds, that writing options is the only way to generate extra income from a portfolio which the investor does not wish to sell. Although there are plainly some attendant risks of exercise of the options written against the stock, the Court finds that Plaintiff had been informed of the risks both by Billings and the OCC prospecti with which he had been provided. As a well-educated lawyer he was fully able to understand the risks and make the choices that he did make. *See M & B Contracting Corp. v. Dale*, 601 F.Supp. 1106, 1110 and n. 1 (E.D.Mich.1984).

The Court in *M & B* aptly discussed a factual situation similar to that found here:

> In fact, Saputo's entire testimony about M & B's investment objectives is hard to believe. He claims that its initial goal was a safe, readily available liquid investment that would earn a respectable and consistent return, and he claims that objective never really changed. This is refuted completely by the facts. M & B went into a pattern of short term, roller coaster, in-and-out margin and option trading that was about as far from a safe readily available liquid investment as possible. There is little question that he knew exactly what he was doing. This is borne out by months of careful record keeping and ... hundreds of conversations between him and Dale [the stockbroker] and almost daily conversations between him and Senior [Saputo's corporate superior].

*Id.* at 1110.

Plaintiff was similarly well suited to trading on margin. There is always risk that collateral put up for a loan will be lost if the debt secured is not repaid. Plaintiff knew this. He was, after all, a lawyer, and as a former city treasurer, one of his responsibilities was to sign for the city's loans. Moreover, the risks to collateral posed by a margin account were disclosed on the margin agreements, *which Plaintiff signed* on two occasions.[9] In providing his stocks as collateral, he clearly decided that he was willing to take the risk to his heirloom portfolio inherent in that action which was fully known to him.

Billings' statement to Plaintiff that the margin account would provide greater protection to his heirloom stock seems accurate, for, in case of an option exercise, Plaintiff could buy stock on margin and meet the call without being required to give up any of his heirloom stocks. There could have been no doubt in Plaintiff's mind, however, that any debt incurred on margin would eventually have to be repaid. Moreover, he knew from his monthly statements that his debt was increasing. Plaintiff at any time could have repaid the margin debt with funds from other sources (e.g., sale of real estate) and there would have been no threat to the stock he had used as collateral. Despite the fact that

---

**9.** For example, the Merrill Lynch margin agreement provided:

> Any and all securities ... now or hereafter held or carried by you in any of my accounts ... are to be held by you as security for the payment of any liability to you in any of said accounts ... You shall have the right, whenever in your discretion you consider it necessary for your protection, ... to sell any or all securities or commodities which may be short in such account(s) ... all without demand for margin or additional margin ...; it being further understood that I shall at all times be liable for any deficiency remaining in such account(s) in the event of liquidation thereof in whole or in part by you or by me.

The Tucker Anthony agreement contained similar language.

Plaintiff's arguments are couched in terms of threats to the heirloom stocks, the Court notes that there was never a margin call and no heirloom stock was ever sold during Billings' tenure as Plaintiff's stockbroker.

Plaintiff argues that the risk that the margin stock would decrease in value was sufficiently great that the buy/write strategy was not suitable for his conservative investment goals. The record plainly shows, however, that Plaintiff knew that the value of margin stocks could fluctuate, as could any stocks. Also, generally, the quality of the stocks purchased on margin was very high and they were compatible with the stocks in his heirloom portfolio. Sometimes, in fact, Plaintiff added stocks he had bought on margin to his heirloom portfolio.

### III. *The Churning Claim*

 Plaintiff also contends that Billings is liable under section 10(b) and Rule 10b–5 for excessive trading in his account after June 30, 1977. Excessive trading, or "churning," is a "practice whereby a broker-dealer effects transactions in an account which are excessive in light of its size and character, for his own benefit and without regard to the customer's interests." *Landry v. Hemphill, Noyes & Co.,* 473 F.2d at 368, n. 1. In order to recover on his claim of churning, Plaintiff must prove that Defendants exercised control over the securities account, traded excessively in light of Plaintiff's stated objectives and the nature of his account, and acted with intent to defraud or with willful and reckless disregard for Plaintiff's interests. *See Tiernan v. Blyth, Eastman, Dillan & Co.,* 719 F.2d 1 (1st Cir.1983); *Follansbee v. Davis, Skaggs & Co., Inc.,* 681 F.2d 673, 676 (9th Cir.1982).

 In *Tiernan* the Court of Appeals for the First Circuit recently approved jury instructions which set forth the proper considerations in deciding the issue of control:

> Who initiated the trading in the account? Did [plaintiff] purchase stocks not recommended to him by [the broker]? Did [plaintiff] act on his own? Or upon the advice of another invest-

ment service? Who initiated the trading in the account? Did [plaintiff] reject [the broker's] recommendations with respect to the purchase of some investments?

> The jury was also instructed to consider evidence of [plaintiff's] general business acumen, investment background, and knowledge of the broker's investment activities.

*Tiernan,* 719 F.2d at 3 (quoting lower court's instruction).

Plaintiff argues that it is clear that Billings controlled the account because it was he who initiated all the trades, with Plaintiff never acting on his own or on the advice of others but routinely following Billings' advice. The Court cannot agree. As it has previously found, Plaintiff was a well-educated, sophisticated investor. He monitored his account constantly and in great detail, checking confirmation slips as they were sent to him, checking the monthly statements, and making notes about the account for himself and his accountants. He had sufficient financial acumen to determine his own best interests. *See Carras v. Burns,* 516 F.2d 251 (4th Cir.1975).

The frequency of Plaintiff's visits and communications with his broker also shows that he was not a passive investor but took an active role in the management of his account. *See Leib v. Merrill Lynch, Pierce, Fenner & Smith, Inc.,* 461 F.Supp. 951, 956 (E.D.Mich.1978). All of the proposed trades in his account were explained to him and discussed with him by his broker *before they were made. See M & B Contracting Corp. v. Dale,* 601 F.Supp. 1106 at 1111; *Leib v. Merrill Lynch,* 461 F.Supp. at 956. Plaintiff admitted that he thought he understood them and that he approved of them at the time. The Court is satisfied that Billings thought, and was justified in thinking, on the basis of their frequent discussions, that Plaintiff knew what was taking place in his account. While it is true that Plaintiff trusted Billings, he kept track of both the market and the account himself and could have disagreed with and stopped the strategies em-

ployed at any time. The record demonstrates that Plaintiff did, indeed, know how to say no to Billings, for he did so in February 1979 when Billings suggested selling some of the heirloom stock, an action which Plaintiff did not perceive to be in his best interest. *See Follansbee*, 681 F.2d at 676.

██ As the Court in *Tiernan* pointed out, the fact that Plaintiff routinely followed his broker's advice cannot negate Plaintiff's active role in controlling the account:

> Evidence that an investor routinely followed his broker's recommendations is certainly an important consideration in deciding who controlled an investment account but this evidence alone is not determinative. Consideration of the investor's sophistication in securities transactions and independent evaluation about the handling of his account are at least equally important.... To hold otherwise would prevent imputing control to the highly sophisticated investor who actively monitors his account but typically does not disagree with his broker's recommendations.

In the Court's view, Plaintiff is the sophisticated investor contemplated by the *Tiernan* court. On the record before it, the Court finds that it was Plaintiff, not Billings, who controlled the account. Plaintiff has not, therefore, proved a necessary element of his churning claim.

The Court notes that the Plaintiff has failed to establish his churning claim in other respects as well.[10] He has argued at great length that the trading in his account was excessive and, in fact, the record shows that Plaintiff's account engaged in a large number of transactions in 1977 and thereafter. The excessive trading element is not established, however, unless the frequency of the trades is unrelated to the customer's objectives. As has been stated *supra* at 482, and as will be discussed

*infra* at 486–487 at greater length, although Plaintiff claimed to have a fixed conservative investment objective, that was not the case. Plaintiff testified himself that he understood and approved of the new, complex trading strategies that Billings proposed. It is clear from his devotion and attention to it that he reveled in the high level of activity in his account. As the Court stated in *Follansbee*, 681 F.2d at 676, "[b]y whatever standard excessiveness is to be measured ... the many positive steps taken by [plaintiff] to insure that his account was actively traded negate any inference that the level of trading in his account was inconsistent with his stated goal." *See also M & B Contracting Corp. v. Dale*, 601 F.Supp. at 1110.

### IV. *Misrepresentations*

Plaintiff's final claim is that Billings misrepresented or failed to disclose to him certain material facts about his account. As Plaintiff suggests, the traditional elements of such a section 10b–5 action are *scienter*, material omissions and/or representations, reliance and due care by the plaintiff. *Holmes v. Bateson*, 583 F.2d 542, 551 (1st Cir.1978). Specifically, Plaintiff alleges that Billings misrepresented to him the profitability of his account, and that Billings failed to disclose the risks of the margin account to the heirloom stock.

██ Plaintiff argues that he maintained his account with Billings for three years to his detriment because he was misled as to the profitability of his account. He contends that he kept track of the profitability of his account entirely by consulting the balance of an options checkbook he maintained. He further contends that Billings knew of his reliance on the checkbook for this purpose and told him that the monies sent to him were profits. The parties agree that Billings initially was to send Plaintiff all the proceeds of the securities account, which Plaintiff would then deposit in the checking account. When necessary,

---

**10.** The Court will also note that given the complexity of Plaintiff's account and the volatile market forces exerted on it during the period in question, it would have been at a loss to evaluate the raw data presented by Plaintiff without the aid of expert testimony. *See Landry v. Hemphill*, 473 F.2d at 374.

Plaintiff was to send a check to Merrill Lynch from the same account to buy back positions which were closed out.

It is clear from the testimony that the arrangement changed early in 1977, but there is disagreement as to what the new arrangement was. Plaintiff claims that Billings was to send out net options *profits* and that he was to send money in to cover losses. Billings contends that he was instructed to send out net options premiums and that Plaintiff was to send in checks for buybacks if there was not sufficient money in the account for that purpose after the netting procedure took place. Billings explained that sometimes profits on spread transactions were included in the checks for proceeds.

The Court finds that Plaintiff did not believe, or if he did believe, that he acted unreasonably in believing, that all the monies sent to him by Billings were profits. Plaintiff received confirmation slips on every transaction engaged in and knew how to, and did, use them to calculate his profits and losses. In fact, when preparing figures for his tax returns for 1977, he calculated his profits and found that there was a $13,000 discrepancy between his profits and the amount of money Billings had paid out to him from the account. The amount included on the tax return as profits was that calculated by Plaintiff rather than the higher figure paid out. Plaintiff made no alteration in the checkbook balance to reflect the difference. The fact that Plaintiff knew that it was premiums rather than profits being distributed was also demonstrated earlier, in July and August 1977. In July Plaintiff asked for, and Billings sent him, $20,065.25 from the account. In August Billings asked for $306 back as an overpayment. In his options checkbook Plaintiff referred to this pay-

ment as a payback of an overpayment of options *premiums*.[11] Again, examination of the monthly statements makes plain that often checks representing proceeds or an opening transaction were sent out when profits or losses could not have been generated because the positions had not yet been closed. The Court finds that this information was both available to and understood by Plaintiff. Moreover, Billings testified, and the Court finds, that Billings specifically explained this to Plaintiff. When Plaintiff inquired about the $13,000 discrepancy between money sent him and profits, Billings explained to him that the excess consisted of options premiums for options that had been sold and were still in the account at the end of the year. Plaintiff replied, "Yes, that's right."

Although Plaintiff testified that his arrangement with Billings had changed and that Billings was supposed to send him profits while he sent Billings checks to cover losses, he never sent in a check to cover losses. He knew, however, that he had sustained losses. For example, he knew of the substantial losses he sustained in April and October 1978 and he knew of a wash sale loss which he had deliberately decided to take in 1977. Billings testified, and the Court believes, that Plaintiff decided affirmatively to try to work out these losses in the account over time rather than pay the money into the account. To that end, certain checks representing proceeds were less than they normally would have been, the excess money having been left in the account as a contribution against the loss. Thus, the Court finds that the Plaintiff did not believe that the payouts were profits.

Even if he had believed that they were, he was not justified in doing so. As has

11. A less tangible confirmation of the fact that Plaintiff knew the payments he was receiving were not profits is provided by Jefferson Kimball's testimony concerning a meeting he had with both Plaintiff and Billings. At that meeting, Plaintiff explained to Kimball the system of payment he wanted Kimball to use. Kimball was to net the profits and losses and mail a check if there were profits. Plaintiff, in turn, was to be notified if there were losses and would send in a check to cover them. When Plaintiff was explaining this, he stated that he and Billings had had several different payout arrangements, and he and Billings at that time exchanged a smile. Billings later told Kimball that at various times when Plaintiff wanted money, excuses were made for him to take it out of the account.

now often been stated, Plaintiff was a sophisticated investor who had the ability and the necessary data to calculate his own profits and losses. The alleged misrepresentations were very specific and easily susceptible of verification or refutation to one possessing Plaintiff's acumen. *See Kennedy, Trustee, et al., v. Josephthal & Co., Inc.,* 635 F.Supp. 399 (D.Mass.1985). Due diligence in this case required that Plaintiff take the ample opportunity he had and evaluate any misrepresentations made to him in light of the information available. *Id.; Holtzman v. Procter, Cook & Co., Inc.,* 528 F.Supp. 9, 14 (D.Mass.1981) (discussing due diligence for statute of limitations purposes). That the account had large losses was evident from the confirmation slips and monthly statements. *See Holtzman,* 528 F.Supp. at 14. The magnitude of Plaintiff's failure of due diligence in assessing Billings' alleged misrepresentations is demonstrated by the fact that he not only had and reviewed the confirmation slips and monthly statements, but his own calculations disclosed that his profits for 1977 were $13,000 less than allegedly represented and paid out by Billings; yet he testified that he continued to believe the checks were profits. Under all the circumstances, the Court cannot find that Plaintiff was justified in relying on any representations Billings might have made concerning profitability. *See Kennedy,* slip op. at 4; *Zobrist v. Coal-X, Inc.,* 708 F.2d 1511 (10th Cir.1983).

The Court does not believe that Billings represented the payouts from the accounts as profits. The alleged misrepresentations were, like the misrepresentations addressed in *Kennedy,* "clear and specific; they were not mere puffing or vague allusions to the future profitability. As specific statements, they were subject easily to verification or refutation." *Kennedy,* No. 80–0132P. Billings appeared on the witness stand to be an astute, experienced stockbroker, thoroughly familiar with the financial habits of his customer John Xaphes. It is inconceivable that he would engage in repeated facile lies which would have been so easily discoverable by Plain-

tiff, who devoted much time and attention to his account. If Plaintiff did at times misunderstand the profitability of the account, which the Court does not believe to be the fact, that misunderstanding could only be self-induced, resulting from the differing arrangements Plaintiff had over time with Billings as to the basis for payouts.

■ Similarly, Plaintiff cannot recover for Billings' alleged failure to disclose to him the risks to his heirloom stock of trading options on margin. As the Court stated in *Thompson,* "[I]mplicit in an omission to disclose case is proof by Plaintiff that he did not know of the omitted fact." *Thompson,* 539 F.Supp. at 864. Here the risks of trading on margin were disclosed in the margin agreements of both Tucker Anthony and Merrill Lynch. The agreements stated specifically that the firms could acquire the collateral if the margin debt were not paid. The collateral, which Plaintiff deposited in the account, consisted of his heirloom stock. He knew, too, that his margin stock could decline in value. The OCC prospectus and other options information, which Plaintiff had read, disclosed the particular risks inherent in trading options on margin. There was, therefore, nothing Billings could have disclosed to Plaintiff that he did not already know.

Additionally, the Court is persuaded that Billings discussed the risks of margin trading with Plaintiff as he testified he did. Kimball, whom the Court found to be a most credible witness, testified that his conversations with Plaintiff showed him to be aware of the situation in his account, indicating that Plaintiff's knowledge was either self-gained or imparted by Billings. Plaintiff was unsurprised to hear that the account had little buying power and affirmatively suggested a means by which Kimball should try to avoid premature exercise of some calls. If Plaintiff did not know the risks to his portfolio of trading on margin, it was because he intentionally blinded himself and refused to acknowledge the obvious facts. This Court agrees with the *Zobrist* court that such ostrich-like behavior

is reckless and bars recovery under Rule 10b–5. *Zobrist,* 708 F.2d at 1518–19.

After prolonged exposure to this case, the Court is convinced that Mark Billings did not intend to defraud Plaintiff, nor did he do so recklessly. While Billings may not have been the wisest of all possible brokers, the Court is satisfied that he devised his strategies for Plaintiff with Plaintiff's best interests in mind, basing them on the market research of both of the firms he represented. The Court is persuaded that Billings devised the plans in concert with Plaintiff and proposed newer, more complex strategies because of Plaintiff's enthusiastic interest and because of Billings own enthusiasm to creatively assist the financial interests of the Plaintiff. Plaintiff was in constant, indeed, avid communication with Billings at all times while Billings managed his account. The Court fully believes Billings' testimony that he and Plaintiff discussed both the market and Plaintiff's strategies in great detail. As has been previously stated, the Court believes that Billings was fully justified in thinking, as he did, that Plaintiff understood his account, his trading strategies, and their discussions concerning the risks and advantages of those strategies.

Xaphes knew the risks but chose to put them out of his mind and engage, in the spirit of hopefulness, in the heady business of active trading on the stock and options markets. Moreover, as the roller-coaster ride continued, Plaintiff knew what was happening to his account but delayed taking any curative action. Plaintiff knew that the dramatic rise in the market in April 1978 and the equally dramatic fall in October 1978 both caused significant losses in the account. It must have been clear to him that the market declined significantly during Billings' tenure as his broker, having a sharp impact on both his margin and heirloom stocks. For example, the price for calls on the heirloom stock Eastman Kodak declined from $120 to $45, and Billings testified that this stock alone contributed to a decline in the equity in the account of approximately $100,000. The monthly statements showed Plaintiff the debit balance and he was able to calculate his equity. Moreover, Plaintiff generally knew whether he had made or lost money on any given transaction. Plaintiff refused to acknowledge the facts that he must have known about the account, and took money from it to pay for Cadillacs, real estate and travel. If he was, in fact, confused about the status of his account when Kimball took it over, his confusion arose from the fact that he had ignored the consequences of his trading efforts.

Billings' later inaccuracies in filling out forms relating to Plaintiff's financial status are somewhat troublesome to the Court because as time went on Billings knew much more about the personal position and resources of Plaintiff than he did in the early stages of their relationship. On the record before it, however, the Court cannot find any sinister motivation, at odds with any interest of the Plaintiff, that could have precipitated the continuing provision of inaccurate information about the Plaintiff by Billings. The Court can only conclude that the conduct resulted from inattentive and thoughtless performance of what seemed to Billings to be a ministerial detail in filling out these papers. This conclusion is reinforced by the fact that Billings consistently provided divergent and often wrong information on other, more innocuous, subjects as well; for example, Plaintiff's age and number of dependents varied from month to month on different forms.

Plaintiff testified that at one point he made an observation about "a large discrepancy" arising because "my accountant showed a profit of $8,000 where my checkbook showed $64,000." Xaphes Tr. at 146. The Plaintiff testified that Billings commented that this was "magic with numbers" and that "he assured me when I asked him again if these numbers were profits that he sent out as we had agreed to during the year 1978 ... [a]nd he said yes, I assure you these are profits that I have calculated from your account and sent out to you." *Id.* Plaintiff attempts to portray the remark about "magic with

numbers" as a device used by Billings to conceal from Plaintiff the fact that he was receiving more money from his account than just his profits. While Billings may have used the phrase, the Court does not accept as credible Plaintiff's version of the conversation.

The Court does not believe, as found above at 36–37, that Billings ever gave Plaintiff the indicated assurance that the money he had received from the account was profits. Even if he had, Plaintiff knew better. The construction of the remark contended for by Plaintiff disregards the context in which it was made, if in fact it was made, as well as the knowledge of the Plaintiff as to what was happening in his account at the time. In the context of a discussion about the amount of profits reported as income for tax purposes, the remark is simply a shorthand way of pointing out that the arithmetic of tax computations has a different basis than do determinations of profits from the Plaintiff's options trading. If made, the reference was not intended by Billings to conceal any information from Plaintiff about the nature of the payments Plaintiff had received from his account as of that time and it did not, in fact, have any such effect.

Plaintiff also makes much of Billings' failure to respond at length to the Plaintiff's assertion at the end of the Tucker Anthony period that he was surprised to find at that time that he had a debit balance in his account. The Court finds that Billings did not answer Plaintiff's questions because they seemed unfounded and unbelievable to him. The Court has already found, and Billings knew, that Plaintiff was well aware of the debit balance. Comprehending that Plaintiff was very upset, Billings shrank from an unpleasant confrontation with the Plaintiff that could not yield any productive result. While perhaps not the most mature response, his failure to answer Plaintiff's questions was simply a recoil from such a discussion and in no way constituted an admission of the truthfulness of the Plaintiff's patently unfounded assertion of surprise.

■ Plaintiff has also asserted that Defendants are liable to him for Billings' alleged misrepresentations under section 12(2) of the 1933 Act. In order to prove his case under this statute, Plaintiff must establish that (1) Defendant made a false or misleading statement of material fact or failed to state a material fact necessary in order to make the statement not misleading; (2) the Plaintiff did not know of the untruth or omission; and (3) the Defendant knew, or in the exercise of reasonable diligence could have known, of the untruth or omission. *Cook v. Avien, Inc.,* 573 F.2d 685, 693 (1st Cir.1978). The Court has found that Defendant Billings neither made the alleged misrepresentations concerning the profitability of the account nor failed to disclose material facts concerning the risks to Plaintiff's heirloom stock of trading on margin.

■ The Court, therefore, finds no liability on the part of Defendant Billings under either section 10(b) of the 1934 Act and Rule 10(b)–5, 15 U.S.C. § 78j(b), or section 12(2), 15 U.S.C. § 77*l*(2), of the 1933 Act. Since there is no primary liability of Billings for fraud, Defendants Merrill Lynch and Tucker Anthony are not secondarily liable under section 20(a) of the 1934 Act, 15 U.S.C. § 78t(a), section 15 of the 1934 Act, 15 U.S.C. § 78*o*, or the common law doctrine of *respondeat superior.*

## V. *Unsuitability After August 16, 1979*

Plaintiff has also asserted claims for unsuitable trading, churning, and misrepresentation against Merrill Lynch for the conduct of its broker, Ronald Stephens, from the time the account returned to Merrill Lynch from Tucker Anthony on August 16, 1979 until May 1980. Plaintiff asserts first that he was more unsuitable than ever in 1979 for options trading. He claims that his ignorance about the components of his debit balance show that he had not gained investment sophistication and that more than before he needed the income from his stocks to support himself and pay down the debit he had accumulated. The Court cannot accept Plaintiff's characterization.

■ By the time Plaintiff began to talk to Mr. Stephens in early August 1979, he had been trading options for three years. He knew that he had accumulated a large debit balance. Stephens and Jory Berkwits, the Merrill Lynch office manager, suggested several possible plans for Plaintiff to deal with his income and debit balance needs. Two of the proposed plans contemplated selling stocks or selling or renting real estate and paying off the debit balance. The third plan proposed writing options "like a machine" to generate income in addition to dividend income that might be used to address the debit. Both Berkwits and Stephens had considered the pertinent financial information and determined that Plaintiff, whose account had remained open at Merrill Lynch, was still suitable for writing options. Plaintiff, who knew about and had experienced the negative consequences of the risks of trading options, rejected the first two proposals and decided to write options "like a machine." No one has testified that options trading was unsuitable for Plaintiff, and, in fact, in August 1979, Plaintiff met the criteria for margin options trading as specified by the brokerage firms' witnesses. Since he understood the risks of trading in his account and decided to proceed anyway, the Court finds that Merrill Lynch is not liable to Plaintiff on his unsuitability claim for the second Merrill Lynch period.[12]

### VI. *Misrepresentations and Omissions*[13] *After August 16, 1979*

■ Plaintiff also asserts that Stephens never disclosed certain facts to him which would have kept him from trading at Merrill Lynch again. For example, Plaintiff contends that Stephens should have disclosed to him that the account was opened again at Merrill Lynch based in part on the erroneous documentation that had been provided by Billings in 1976. The Court has found above that the use of the erroneous documentation by Merrill Lynch, while perhaps not acceptable practice under the stock exchange rules, was not a basis to hold Billings liable for fraud. It cannot, therefore, be bootstrapped into a basis of liability at this level of remove. Moreover, the description of the events described by Plaintiff is inaccurate. The record clearly demonstrates that when Plaintiff moved his account back to Merrill Lynch both Stephens and Berkwits knew his financial situation in great detail. This knowledge provided a supplemental basis for reactivation of the options account at Merrill Lynch.

■ It was this knowledge which also served as the predicate for Stephens' and Berkwits' suggestion to Plaintiff of various ways of dealing with the debit balance in his account. Plaintiff asserts that Stephens knew and should have told him that he could never achieve his investment goals by writing options. Stephens and Berkwits thoroughly discussed all the various plans with the Plaintiff. The limitations of the options plan were made explicit, including the fact that even under optimal conditions it would take six or seven years to pay off the debt in that way. Plaintiff was an individual of substantial means, with a large portfolio against which options could be written to generate extra income to service and pay down the debt. He had told Stephens that he could live on dividend income alone. The Court does not find, therefore, that the options plan was infeasible from the beginning as a program to

---

**12.** The Court finds implicit in Plaintiff's decision to continue writing options an acknowledgment that market forces, and his withdrawal of funds, not his and Billings' trading strategies, were responsible for the accumulation of the debit balance in the Billings period. The Court realizes, of course, that some trading strategies expose an investor to more risks related to market fluctuation than others. The Court has found with regard to the various strategies engaged in that Plaintiff knew of, weighed, and

himself decided to take the risks. Plaintiff's renewed choice to trade options evinces Plaintiff's belief that the trading of options in an appropriate market was a good way for him to make money.

**13.** Plaintiff has not asserted claims under section 12(2) for the second Merrill Lynch period, so the Court will address the issue of misrepresentation only under 10b-5.

achieve Plaintiff's goals. The usual risks of market fluctuation were inherent in it, of course, but these were known to Plaintiff. He chose that program, with its attendant risks, as preferable to the alternative plans that entailed greater certainty but required the sacrifice of a significant part of his heirloom portfolio or other assets.

■ Plaintiff also asserts that Stephens should have disclosed to him what had happened in his account during the first Merrill Lynch period. As has been explained, Plaintiff had received monthly statements and confirmation slips that detailed *everything* that went on in his account. There was nothing for Stephens to tell Xaphes that he did not already know. Although Plaintiff urges the Court to find that Stephens somehow should have conveyed to Plaintiff that his account was poorly supervised during the first Merrill Lynch period, the Court has found that any inadequacy of supervision that did occur had no adverse effect on Plaintiff's financial status. It is unlikely that Stephens would ever have noticed or perceived as important the so-called supervisory failures relating to the earlier suitability determinations and record-keeping at Merrill Lynch. Stephens was concerned with what was going on in the account and what strategies could make it work to achieve Plaintiff's goals of paying down the debit. To the extent that historical information was useful to him, it dealt with the trading and withdrawals in the account, not previous approvals, for it was clear that Plaintiff had been and was suitable for trading as he did. Plaintiff may not have desired the ultimate result of his active investment strategies, but he chose them knowing full well the risks they entailed.

■ An additional assertion of Plaintiff is that Stephens should have disclosed to him that it was Billings who had recommended that Merrill Lynch try to reacquire the account. Although Plaintiff claims that he would not have chosen to go to Merrill Lynch if he had known this, the Court finds that this is not a material fact

in the sense necessary to establish a Rule 10b–5 violation. An omitted fact is material if there is "a substantial likelihood that under all the circumstances, the omitted fact would have assumed actual significance in the deliberations of a reasonable [person]." *SEC v. MacDonald*, 699 F.2d 47, 49 (1st Cir.1983) (quoting, *TSC Industries, Inc. v. Northway, Inc.*, 426 U.S. 438, 96 S.Ct. 2126, 48 L.Ed.2d 757 (1976)).

In this case Plaintiff had had two years of previous dealings with Merrill Lynch. He knew, at least in passing, both Ronald Stephens and Jory Berkwits. He did not decide to transfer his account to Merrill Lynch until after he had discussed his situation at length with Mr. Stephens. A reasonable person possessing the information Plaintiff had about Merrill Lynch would be expected to base his decision of whether to place his account there on his evaluation of these data rather than on the fact that any given individual had recommended that the firm contact him.

■ Even if the Court had found that Stephens was remiss in not disclosing some of the suggested items, it cannot find, on the record before it, that Stephens had the *scienter* requisite to establishment of a 10b–5 claim. Stephens was a sincere, conservative broker who showed himself to be concerned at all times with Plaintiff's best interests. In the Court's estimation, he was as interested as Plaintiff in reducing Plaintiff's debit balance, and he worked very hard to that end. Like Plaintiff's other brokers, Stephens was in constant communication with Plaintiff, and the Court is convinced that Stephens made every effort to apprise Plaintiff of everything he would need to know to make informed decisions about his portfolio. Nothing in Stephens' or Xaphes' testimony showed Stephens to be either reckless or self-serving in his dealings with Plaintiff. Since Plaintiff has not proved Stephens' *scienter*, he cannot recover on his 10b–5 claim. *Bryson v. Royal Business Group*, 763 F.2d 491 (1st Cir.1985).

## VII. *Churning After August 16, 1979*

Plaintiff's final claim is that Stephens churned the account. During the second Merrill Lynch period, the account engaged in 218 transactions, generating $19,394 in commissions. No expert testimony was presented regarding the norm in accounts like Plaintiff's, so it is hard for the Court to interpret these raw data. Also, Plaintiff affirmatively chose the strategy of "writing options like a machine" to try to pay down the debit. Obviously, more transactions rather than fewer were necessary and desired to generate more premium income to effectuate this goal. Most importantly, however, the record again mandates a finding that Plaintiff, not his broker, controlled the account, thus precluding recovery on this theory.

Plaintiff was in constant contact with his broker during the second Merrill Lynch period. The conversations dealt with all aspects of the account, profits and losses, the debit balance, equity, and the status of options that had been written. His sophistication was at least as great as it had been previously, and he had had extensive experience in trading options. Significantly, also, when Plaintiff retired from the practice of law in 1979, he wrote a note to his accountants that a deduction for his office could still be maintained because he now used the office *for his stock and options investments and for no other purpose.* Plaintiff also demonstrated his sophistication by telling his accountants that he had corrected the listing of stock transactions made by his broker for tax purposes and by telling the accountant that capital gains from certain stock transactions could be offset by a large deduction for commissions this year. It is plain, from these items, that Plaintiff knew in great detail and was actively involved in what was going on in his account. Without showing that the broker controlled the account, Plaintiff cannot make out a claim of churning. *See Tiernan,* 719 F.2d at 3; *Landry*

*v. Hemphill,* 473 F.2d at 368, n. 1. Since Plaintiff again has not shown any primary liability on the part of Stephens, he cannot make out a case of secondary liability against Merrill Lynch for the second Merrill Lynch period.[14]

Accordingly, it is ORDERED that judgment be entered for the Defendants.

14. After the conclusion of trial, Plaintiff filed a motion for the Court to reconsider its previous denial of a motion to amend the complaint to add claims under RICO, the Racketeer Influenced and Corrupt Organization Act, 18 U.S.C. §§ 1961–1968. In the Court's view, the determination that no fraud occurred in this case moots the pending motion.