Robert W. KEARNS, Plaintiff,

v.

FORD MOTOR COMPANY, Defendant.

Robert W. KEARNS, Plaintiff,

v.

WOOD MOTORS, INC., Daimler-Benz Akteingesellschaft, and Dr. Ing. h.c.F. Porsche A.G., Defendants.

SWF–SPEZIALFABRICK FUR AUTO-ZUBEHOR GUSTAV RAU G.m.b.H. a corporation of the Federal Republic of Germany, Plaintiff,

v.

Robert W. KEARNS, Defendant.

Civ. A. Nos. 78–70740, 78–70642 and 79–74451.

United States District Court, E.D. Michigan, S.D.

Feb. 3, 1987.

Dale R. Small, Detroit, Mich., Keith V. Rockey, Chicago, Ill., for Robert Kearns.

D. Dennis Allegretti, Chicago, Ill., Robert D. Sanborn, Ford Motor Co., Dearborn, Mich., for Ford Motor Co.

Richard E. Rassel, Kenneth J. McIntyre, Detroit, Mich., Paul M. Craig, Washington, D.C., for SWF, Benz, Woods and Porsche.

Joshesph Yamin, Allen R. Miller, P.C., Birmingham, Mich., for Dennis Kearns.

MEMORANDUM OPINION AND ORDER IMPOSING SANCTIONS AND PERMITTING WITHDRAWAL OF COUNSEL

PHILIP PRATT, Chief Judge.

This is the lead case in a series of patent infringement suits filed by Dr. Kearns

against various automakers and Diamler-Benz, and Porsche. S.W.F., a German auto components supplier, filed a patent declaratory judgment suit in Maryland against Dr. Kearns. After an extensive jurisdictional delay, the court in Maryland transferred venue of the SWF case to this court. These cases have been consolidated for pre-trial purposes.

This is a patent case of unusual dimensions. It involves a man and his son who have been engaged in a protracted struggle with many of the major automakers in the United States and Europe. Since its inception, this lawsuit has proved to be fertile ground for problems. What is now before the court are a series of motions to dismiss filed by the defendants, precipitated by revelations which suggest outrageous and highly unethical conduct engaged in on behalf of the plaintiff. The facts giving rise to these motions are the stuff of detective novels.[1]

The plaintiff is Robert W. Kearns, a former Wayne State University Engineering Professor. He holds seven patents to circuitry which is integral to electronic intermittent windshield wipers. Central to this lawsuit is the plaintiff's son, Dennis Kearns, who is a licensed private investigator. The younger Kearns' involvement in this litigation has not been pedestrian. He has been substantially involved in each and every aspect of his father's lawsuit.

At issue is the conduct of Dr. Kearns and his son in surreptitiously acquiring privileged documents from the Washington, D.C. offices of defense counsel. Neither plaintiff nor his son were entitled to the documents. After obtaining these documents, Dennis Kearns set up a smokescreen to divert defense counsel from determining how he obtained them.

On August 15, 1983, the plaintiff filed a motion for summary judgment. Attached to the motion were exhibits the defendants considered highly confidential and privileged. Included in the documents were

internal memoranda regarding meetings between the defendants at which the validity of the Kearns' patents were discussed. Some of the same documents were attached to the plaintiff's brief in opposition to SWF's motion for preliminary injunction *pendente lite*. None of these documents had been obtained by the plaintiff through normal discovery channels.

On September 9, 1983, the defendants moved to restrain and enjoin the plaintiff from using the confidential documents. Less than a week later, the court issued a restraining order prohibiting any use of the documents other than in connection with the pending litigation. The documents were subsequently held to be within the attorney work-product privilege and ordered returned to the defendants on June 29, 1984.

In attempting to find out how plaintiff acquired the privileged documents, defendants met with much resistance. The plaintiff had to be ordered to answer interrogatories concerning the source of the documents. In answer to an interrogatory, plaintiff stated that Dennis Kearns, his son, obtained the documents "from a former employee of the law firm of Craig and Antonelli." The Craig and Antonelli firm represented several of the defendants until July 1, 1982. The firm was dissolved and Craig alone now represents these defendants. The revelation that the plaintiff obtained the documents from an insider sparked an intensive inquiry by defendants to determine how the documents were acquired.

Dennis Kearns was not helpful when the defendants asked him to provide details concerning his procurement of the documents. On several occasions the defendants were forced to obtain court orders requiring Dennis Kearns to supply them with relevant information. Bench Ruling, November 3, 1983, at 6, 8; Order Denying Dennis Kearns' Motion for Protective Order, July 9, 1984. Once Dennis Kearns

---

1. On December 6, 1985, the court conducted an evidentiary hearing which focused on the plaintiff's allegedly improper conduct.

realized that he would have to reveal the source of the documents, he went to great efforts to contact his source. He questioned her neighbors and family, and used other means to track her down. Dennis Kearns' Deposition, February 8, 1985 at 28–29, 36–37. [Thereafter D. Kearns Dep.] Finally, in late 1984, he located her and warned her that her name would be revealed in the pending litigation. *Id.*

The February 8, 1985 deposition of Dennis Kearns was the next step in tracking down the source of the confidential documents. Dennis Kearns finally admitted that he received the documents in 1980 from a Craig and Antonelli paralegal named Laurie J. Fitzpatrick. According to the deposition, Kearns first met Ms. Fitzpatrick at a paralegal seminar at George Washington University in Washington, D.C. D. Kearns Dep. at 14. The deposition suggests that after the two met, Ms. Fitzpatrick offered the documents to Dennis Kearns.

Q: [Defendant's counsel] Did you, at any time, discuss with her, prior to receiving the documents, obtain any documents from her? Before you got this set of the documents from Ms. Fitzpatrick, did you, at any time, discuss with her, before then, the possibility of getting some documents from her?

A. [Dennis Kearns] I think she'd asked me whether I wanted a set.

Q. What did she tell you, to the best of your recollection?

A. I'm not sure. What do you mean, "what did she tell me?"

Q. What did she offer to provide you with? What do you recall about the conversation?

A. Well, it was a long time ago. I—it's hard to really remember the conversation.

D. Kearns, Transcript at 16–17. This meeting, he admitted in his deposition, also marked the beginning of an eight month intimate relationship which came to an abrupt halt once he obtained the documents. D. Kearns Dep. at 30, 43, 49, 171, 176.

What Dennis Kearns did with the documents after he received them from Ms. Fitzpatrick was not altogether clear from his deposition testimony. In October, 1982, Dennis Kearns was in Stuttgart, Germany for the deposition of some of the defendants' employees. In a Stuttgart hotel room, Dennis Kearns showed the documents to his father and his father's attorneys, Keith Rockey and Thomas Elliott—apparently for the first time. D. Kearns at 50.

Q. [Defense attorney] What did Mr. Rockey say when you showed him the documents?

A. [Dennis Kearns] I think he was a little surprised, but I'm not sure he understood what they were.

Q. Well, did you tell him what they were?

A. I'm not sure exactly what terms I used.

Q. Did you tell him they came from the files of Craig and Antonelli?

A. I think I probably told him that they appeared to, yes.

Q. When he turned them over to Elliott what did he tell him to do with the documents when he turned them over?

A. I don't think he instructed Tom at all.

Q. Did anyone ever tell you to return any of these documents?

A. Yes.

Q. Who?

A. I think Keith and my dad, both.

D. Kearns Dep. at 128.

There are indications in Dennis Kearns' testimony that he was aware of the sensitive nature of the documents he had obtained. When asked if he knew that Ms. Fitzpatrick usually worked with confidential documents, Dennis Kearns replied that "she normally handled documents which were under protective orders and that type of thing." In fact, it appears that Dennis Kearns was told that the documents he received were privileged. D. Kearns Dep. at 17, 18–19. He stated, "I remember she had said something about giving some documents, either privileged, or those under

protective order, to parties outside of the lawsuit." D. Kearns Dep. at 27. Even knowing that the documents were privileged, or at least confidential, Dennis Kearns stated that he had "no problem accepting them from her." D. Kearns Dep. at 90.

The purloined documents surfaced again in 1983. After returning from Germany, copies of the documents were provided to reporters for the Washington Post and the Washington Business Journal. D. Kearns Dep. at 104. The reason for this disclosure to the news media was based on what Dennis Kearns called his concern for the public's right to know. Dennis Kearns admitted in his deposition that he supplied copies of the documents to other third parties, and to U.S. District Judge Charles Joiner, who refereed settlement negotiations between the plaintiff and other parties. *See* D. Kearns Dep. at 99–101, 107, 119–120, 235.

The next chapter of this story unfolded in late 1985. Despite zealous efforts by defense counsel, they had been unable to locate or depose Ms. Fitzpatrick. She was finally located and deposed on November 19, 1985 in Washington, D.C. Ms. Fitzpatrick's deposition indicates that she, indeed, met Mr. Kearns at a seminar in Washington, D.C. But the rest of her version of how Dennis Kearns acquired the documents from her varies from the story given by the younger Kearns. After the seminar, Dennis Kearns asked Ms. Fitzpatrick out for a drink. That marked the beginning of their eight month relationship. L. Fitzpatrick Deposition, Nov. 19, 1985, at 13.

Ms. Fitzpatrick admitted that she had supplied Mr. Kearns with at least some of the documents at issue here. Here is an excerpt from her deposition testimony:

> [H]e called me up at work at Craig and Antonelli, and he said that he had been waiting for documents that had been agreed upon at a hearing that Mr. Craig was suppose to send him, and he hasn't gotten them yet, that he was supposed to get them from me. And I said, 'well tell me again what these documents are,' and he says, 'well, they are documents I am entitled to have, they haven't come and I've been told I'm supposed to get them from you.' I said, 'okay, what are they?' And he said, 'well, some are memos, some are letters, some were in German and some were in English.' And I said, 'well, do you have any numbers?' And he said, 'well, some of them have numbers that I can give you.' And he gave me dates.

> Q. [Defense Counsel] He identified them over the phone to you?

> A. Yes, because, I mean, I had no way. ... [H]e gave me—he told me about letters and a date and who it was to and who it was from, and then the memos, then some that he said were in German, that some had numbers on them and some didn't, and I said, 'well, how am I going to recognize those?' And he said, 'well, do what you can.' And I figured, well, if I can't recognize them, I'll do what I can and I'll ask, you know. And, you know, like a dummy, it didn't occur to me to check this out. And so it took me not even a half an hour, twenty minutes maybe, to pull them together, and— oh, he also told me—I said, 'okay, now, do you want these mailed or are you going to pick them up?' He said, 'no, I'm going to see you tonight anyway, I want to see you tonight, you can give them to me then,' and I said, 'okay.' So, you know, I took a short time putting them together.

Fitzpatrick Dep. at 21–23.

After copying the documents Ms. Fitzpatrick took them to her apartment. That evening Dennis Kearns came to her apartment and she asked him if the documents she had were the ones he was entitled to receive. According to her deposition, he said, "I think so, but I'll have to give them to my father to make sure." Fitzpatrick Dep. at 24. Shortly thereafter, Ms. Fitzpatrick and Dennis Kearns went to a nearby restaurant, where he broke off the relationship.

Ms. Fitzpatrick's testimony at the December 6, 1985 evidentiary hearing mirrored that given in her deposition. *See* Transcript of Evidentiary Hearing, Dec. 6, 1985, at 21–45. [Thereafter Hearing at __]. She recounted the relationship with Dennis Kearns which gave rise to her giving the confidential documents to him. She reiterated Kearns' representation to her that "he was supposed to have received certain documents that have—had been agreed upon and that he hadn't received them. And he was supposed to get them from me." Hearing at 24.

Having observed Ms. Fitzpatrick during her testimony, the court can make the following observations. Her testimony was candid, even though at some points painful. Both her demeanor and her responsiveness to counsel's questions was straightforward. She was not evasive and appeared both truthful and credible.

Another revelation surfaced during Ms. Fitzpatrick's testimony. It was discovered that Dennis Kearns had been withholding certain documents that had been ordered turned over to defendants by an earlier court order. Originals of confidential documents were produced by the plaintiff for the first time at the evidentiary hearing. These were not the documents given to Dennis Kearns by Fitzpatrick, and must have been obtained from the files of Craig and Antonelli in some other fashion.

On examination by Mr. Rockey, one of Kearns' attorneys, Ms. Fitzpatrick was shown three index cards which were marked as Plaintiff's Exhibits A, B and C. The first index card, Plaintiff's Exhibit A, was labeled "Description Lists Porsche Confidential Daimler-Benz Confidential." The index card marked as Exhibit B had the following written on it: "These came from a folder marked as Porsche privileged docs from Patent Department with schedule. The third card, Exhibit C, was marked: "SWF v. R. Kearns Corresp. File Corresp. with ITT." After Ms. Fitzpatrick identified the cards as containing her handwriting, she explained that these index cards were used in maintaining case documents files, essentially to separate and file documents and correspondence. Hearing at 38–40.

It is undisputed that the approximately 15 documents Ms. Fitzpatrick gave to Dennis Kearns were copies and not originals. The three index cards were originals. Ms. Fitzpatrick testified that if she would have given these index cards to Dennis Kearns they would have been copies and not originals. Hearing at 43.

Q. So we can agree, Ms. Fitzpatrick, that these are cards you included in the documents you gave to Dennis Kearns to identify for him where they came from?

A. No, I do not agree that I gave those cards to him. I do not remember putting any cards on any documents that I gave him. I remember writing up lots of cards for categories on documents that I was working with in my office.

Q. That's right. And if you had included those cards in the papers that you gave to Dennis Kearns, you could have given him copies and not originals as Exhibits A, B and C are because you only gave him copies, correct?

A. I didn't copy those cards or any of the cards when I would make copies of documents. They were always right in the front of the files to identify what was what.

When the index cards were offered into evidence, Mr. Craig, defense counsel, objected, arguing that they had been concealed from him and the court in direct contravention of an earlier court order to produce them. Hearing at 46.

At that point, Kearns' attorney, Mr. Rockey, admitted that he too had never seen these index cards before. Hearing at 47. He stated that Joseph Yemin, an attorney representing Dennis Kearns at the evidentiary hearing, had just supplied the cards to him. The court then questioned Ms. Fitzpatrick about the file cards. She agreed with the court's observation that the cards themselves suggest that they were attached to a folder which contained certain documents. The cards, she said, were simply used to help her organize the

different office files and normally did not leave the law firm office.

THE COURT: As I understand your testimony, you're quite vehement that these were not given to Dennis Kearns by you?

THE WITNESS: That's right.

THE COURT: And as far as you know, they were retained in the file?

THE WITNESS: As far as I knew, yes, because when I left there I cleaned up what I was doing. Everything went back in the files and everything. You know, where I'd gotten them.

THE COURT: Would you have taken these home at any time?

THE WITNESS: I wouldn't have had any reason to. The only other work I would take home from the office is when I am digesting depositions.

THE COURT: Can you give me any impression. Let me put it this way: do you know how these documents could have gotten out of your office?

THE WITNESS: I have no idea because I, you know, when I was doing things, I—like I said, I would do the depositions at home sometimes and everything would be in my office or in the xerox room where the files were.

Hearing at 48–49.[2]

Thus, despite the earlier court order requiring disclosure, the index cards were not produced for defense counsel until they were revealed during the evidentiary hearing. *See* Amended Order Denying Motion Of Dennis N. Kearns For A Protective Order, January 30, 1985. Naturally, the possession of the documents raises substantial suspicions regarding the method of obtaining them.[3]

The specificity that Dennis Kearns used in requesting documents suggests that he may have seen the documents or had been made familiar with them before he made his request of Ms. Fitzpatrick. Note the following colloquy between Ms. Fitzpatrick and the court:

THE COURT: What kind of detail did he give you as to the description of the documents that he wanted you to pull?

THE WITNESS: He gave me some dates, he told me that some of the letters would be to so and so, and from so and so, and the same with the memos, and some of them were real general descriptions. And he said that one of them would be a diagram about the part of the wiper system that I don't understand, and that one had a production number on it, that a couple of the documents told me—he told me about had production numbers on them.

THE COURT: I take it you just did not go in and grab anything, conduct a general search, you went to specific files and pulled documents that he described to you?

THE WITNESS: The files were set up so that there was a chronological file so those were real easy to pull out.

Hearing at 50–51.

Dennis Kearns also testified at the evidentiary hearing. Having observed his testimony, the court found him less than credible. In many cases he was evasive. His lack of candor and of credibility suggest to the court that much of his testimony cannot be believed. Dennis Kearns spent much of his time on the witness stand playing semantic games with counsel, trying to avoid answering many questions. In response to many questions from counsel, Dennis Kearns said he did not know the answer or did not recollect the answer. Given the nature of Dennis Kearns involvement throughout this litigation, the court finds many of Dennis Kearns' responses unworthy of belief.

**2.** Upon learning that Dennis Kearns did not produce these documents as required by early orders of the court, defendants' counsel was directed to file a motion for contempt. The motion for contempt, at the defendants requests, is merged into defendants' motion to dismiss based on plaintiff's inequitable conduct.

**3.** Apparently Dennis Kearns was left alone in the file room when visiting the Craig and Antonelli office for the purpose of picking up certain documents.

There were substantial differences between Dennis Kearns' testimony before the court and that given in his deposition. For example, he said during the evidentiary hearing that he was uncertain about what happened to the documents once he received them from Laurie Fitzpatrick.

> Q. After 1982, what happened to the documents? You gave them to your father at some point?
>
> Q. Do you remember when?
>
> A. No, not really.

Hearing at 65. In contrast, Dennis Kearns' deposition testimony was much more specific about what he did with the documents.

> Q. When did you first tell him (Dr. Kearns) that you were getting documents from her (Laurie Fitzpatrick)?
>
> A. In the hotel room in Germany.
>
> Q. Your father was totally unaware of the existence of these documents prior thereto; is that correct?
>
> A. That's correct.

D. Kearns Dep. at 50, 128.

In his testimony at the evidentiary hearing, Dr. Kearns stated that he never knew how his son obtained the documents. He said his son first disclosed the documents to him in October, 1982 in Stuttgart. He described what happened:

> Well, I think Tom Elliott and Keith Rockey and I were in the room talking when Dennis came in then Dennis took Keith aside and gave him this package, and Tom and I continued to talk for awhile; then Keith and Dennis were talking, and maybe after ten or fifteen minutes, then Keith gave them to Tom to look at. So Tom sat down at—I'll call it a dresser, whatever was in the hotel room—and Tom looked at them for some time, then they were put back in the original envelope, which is like what I've seen here today, the accordian type holder, they were given back to Dennis.

Hearing at 3–4. About one-third of the documents Dennis Kearns produced in the hotel room were in English, the remainder in German. Dr. Kearns admitted that he read the English language documents while in the hotel room. Hearing at 13–14.

Dr. Kearns said he had no further contact with the documents until sometime the following December, when he obtained the documents from his son, and tried translating those documents from German to English. When Dr. Kearns realized that his own attempts at translating were insufficient, he contacted Eric Eisensteg who translated the documents for him in sections. Once all the transcriptions were completed sometime in 1983,[4] Dr. Kearns apparently spent an appreciable amount of time studying them.

Dr. Kearns testified that he did not have any compunction about using the purloined documents. Dr. Kearns maintained he never knew where the documents came from. Although he said he asked his son about their source, it appears from his testimony that Dr. Kearns never pressed the issue with his son, or suggested that the documents not be used. Hearing at 9.

On cross examination, Dr. Kearns admitted that he disobeyed the court order requiring that the contents of these stolen documents not be made public. The documents, Dr. Kearns stated, were shown to several newspapers and at least one attorney who is not involved in this litigation. Dr. Kearns did not plead ignorance to the court order, stating that he had read the order "many times." Hearing at 8.

In order to make some sense of what is going on here, the precise misbehavior defendants complain about must be identified. First, there is the conduct of Dennis Kearns in concealing the identity and location of Ms. Fitzpatrick. Second, there are the actions of Dennis Kearns in obtaining the documents themselves. And finally, there are the actions of Dr. Kearns and his attorneys in accepting those documents in the hotel room in Stuttgart and not inform-

---

**4.** The time between when Dr. Kearns had the documents translated, studied them, and took any further action, is quite murky. Neither counsel nor the court was successful in having Mr. Kearns provide precise times and dates for these acts.

ing the court or directing Dennis Kearns to rectify his actions.

Fed.R.Civ.P. 37(b)(2) permits the court to impose a wide range of sanctions for the violation of discovery orders, including dismissal of the entire action.[5] The Supreme Court has said that "Rule 37 sanctions must be applied diligently both 'to penalize those whose conduct may be deemed to warrant such a sanction, [and] to deter those who might be tempted to such conduct in the absence of such deterrent.'" *Roadway Express, Inc. v. Piper*, 447 U.S. 752, 763–64, 100 S.Ct. 2455, 2462–63, 65 L.Ed.2d 488 (1980), citing *National Hockey League v. Metropolitan Hockey Club*, 427 U.S. 639, 643, 96 S.Ct. 2778, 2781, 49 L.Ed.2d 747 (1976); *Anno* 49 A.L.R.Fed. 831. In addition, the court may impose sanctions under the court's own equitable powers. *Link v. Wabash Railroad Co.*, 370 U.S. 626, 82 S.Ct. 1386, 8 L.Ed.2d 734 (1962); *Batson v. Neal Spelce Associates, Inc.*, 805 F.2d 546 (5th Cir.1986). Federal courts are growing increasingly impatient with abuses of the discovery process: Misbehavior by parties and attorneys have sparked a number of rulings in which federal judges have gone to great lengths to engender adherence to the federal discovery rules. *Gates v. U.S.*, 752 F.2d 516, 517 (10th Cir.1975). *See also* Section of Litigation, ABA, "Second Report of the Special Committee for the Study of Discovery Abuse," 92 F.R.D. 137 (1980).

■ The plaintiff argues that the conduct of Dennis Kearns cannot be imputed to him, and is solely attributable to his son. This simply is not true. Earlier orders of this court, as well as that of the magistrate, recognized that Dennis Kearns has acted as an agent of his father in the prosecution of this case. Bench Ruling, November 3, 1983, at 8. The evidence shows that Dennis Kearns has continued to act as the agent or alter ego of his father. The plaintiff admitted in several interrogatory answers that his son has played a crucial role in representing his interests. In one response, Dr. Kearns stated that his son "acted on behalf of plaintiff in the preparation and initiation of this lawsuit ..." Interrogatory Answer No. 446. Moreover, Dr. Kearns stated that his son "has acted in connection with this lawsuit to assist his father ... in the prosecution of this lawsuit ... in attending court hearings, depositions, and like activities." Interrogatory Answer No. 447.

The specifics of Dennis Kearns' activity undertaken on behalf of his father must also be noted. Dennis Kearns testified that he was paid by his father to assist him with this litigation. Hearing at 60–63. His activities ranged from purchasing accused products to attending court hearings and depositions and undertaking various other projects for his father and his father's attorneys. There can be no question that his acquisition of the privileged documents from Ms. Fitzpatrick was on his father's behalf. Hearing at 60, 60–63, 103–104, 124, 191–192. Said Dennis Kearns: "I received them because I thought it would help me investigate this case...." Hearing at 191.

The relationship between Dr. Kearns and his son is similar to that discussed in *Margoles v. Johns*, 587 F.2d 885 (7th Cir.1978), *cert. denied*, 445 U.S. 909, 102 S.Ct. 1256, 71 L.Ed.2d 447 (1982), further proceedings, 798 F.2d 1069 (7th Cir.1986). In that case, the plaintiff's son took an active role in the discovery process, though just as with Dennis Kearns, he was not a party to the suit. The son refused to produce certain documents the court had ordered produced by a specific date. It was not until some two months later that the documents were produced.

---

5. The defendants also invoke Rule 41(b), which permits dismissal where the plaintiff fails to comply with the rules of civil procedure or any court order. It has been held that the imposition of sanctions for disregard of discovery orders depends exclusively on Rule 37, and resort should not be had to Rule 41(b) in cases of discovery abuse. *Societe Internationale Pour Participations Industrielles et Commerciales v. Rogers*, 357 U.S. 197, 207, 78 S.Ct. 1087, 1093, 2 L.Ed.2d 1255 (1958); *Salahuddin v. Harris*, 782 F.2d 1127, 1134 (2d Cir.1986); *Rabb v. Amatex Corp.*, 769 F.2d 996, 999 (4th Cir.1985).

Affirming the district court's dismissal of the entire action under Fed.R.Civ.P. 37(b), the Seventh Circuit stated:

> The record establishes that the deadline for the production of documents was personally communicated to the plaintiff, and his son, and that it was a current, not a long prior forgotten order. The record further establishes that the plaintiff had turned over to his son the basic task of producing the requested documents and that those tardily produced were in fact in Perry's possession.

> In this case, however, the district court was amply justified in treating the failure of the son as that of the plaintiff. Since Perry was the "alter ego" of his father for purposes of documentary production, the court considers the failure of the non-party as that of the party.

587 F.2d at 888.

There can be no doubt that the activities of Dennis Kearns rise far above the level described in *Margoles*. The conduct of Dennis Kearns is directly imputable to his father. Dennis Kearns has represented his father in virtually every phase and aspect of this litigation, he has undertaken legal work and has participated in the discovery on behalf of his father. Dr. Kearns knew about and encouraged his son's activities and accepted the fruits of his son's labor. Dr. Kearns has also ratified the acts of his son. After seeing the purloined documents in Stuttgart, Dr. Kearns and his attorneys apparently did not seriously consider rectifying Dennis Kearns' conduct. By the use he made of these documents, Dr. Kearns accepted his son's conduct and ratified it as his own. In short, the evidence is overwhelming that Dennis Kearns acted and continues to act as the alter ego of his father in this litigation.

The facts establish that Dennis Kearns entered into an intimate relationship with Ms. Fitzpatrick prior to asking for the confidential documents. After misrepresenting his authority to obtain those documents, the plaintiff's son was given some highly confidential and privileged documents belonging to the defendants. On the same night he obtained the documents, Dennis Kearns ended his eight month relationship with Ms. Fitzpatrick. She did not hear from him again until he was forced to reveal her identity in the formal discovery process. Ms. Fitzpatrick's credible testimony indicates that she gave Dennis Kearns copies of approximately fifteen confidential documents.

Dennis Kearns' acquisition of these documents from Ms. Fitzpatrick does not put an end to the story. Dennis Kearns has obtained other confidential documents from a source other than Ms. Fitzpatrick. It is unclear where Dennis Kearns obtained the index cards that were produced for the first time at the evidentiary hearing. Although there is no smoking gun, all the evidence points to Dennis Kearns. He admitted, during his deposition testimony, that he had been in the file rooms at Craig and Antonelli law offices. The question becomes whether he took advantage of this access to remove other documents from the firm's files. Hearing Transcript 49, 70.

Also suspect is the disappearance of internal Porsche documents from the Craig and Antonelli law offices. The firm had received from Porsche several internal patent department privileged documents and a list of these documents. After these documents disappeared they did not surface until they were produced by Dennis Kearns. Dennis Kearns' production of these documents was in accordance with this court's amended discovery order of January 30, 1985.

These bizarre circumstances suggest two possibilities. Ms. Fitzpatrick may have provided Dennis Kearns with all the documents. This is highly unlikely. Ms. Fitzpatrick's testimony seemed candid and forthright. She had nothing to gain by misrepresenting any of her acts to the court. It is likely that Ms. Fitzpatrick did not provide Dennis Kearns with all the documents he obtained. Dennis Kearns either acquired the documents himself or from some other source. Under any of these scenarios, the conduct of the plaintiff

and his son, acting as his alter ego, is inexcusable.

■ The undisputed facts show that Dennis Kearns, acting on his father's behalf, used Ms. Fitzpatrick as a pawn in this litigation. By misrepresenting his authority to obtain the documents and by considering the subsequent course of conduct taken by Dennis Kearns, it appears that plaintiff's and his son's conduct was a deliberate and studied strategic decision to circumvent the discovery process. Given Dennis Kearns' lack of credibility and evasiveness before this court, the court has no choice but to find the misconduct willful and deliberate. Although Dennis Kearns attempts to portray himself as an innocent cast in the high-powered business of lawyers and automakers, the facts show otherwise. Given Dennis Kearns' background as a private investigator and his apparent sophistication, the court must conclude that Dennis Kearns engaged in an orchestrated and devious attempt to circumvent the discovery process. In sum, the court finds that the plaintiff intentionally disobeyed both the rules of civil procedure and several of this court's orders.

■ The court is very disturbed by the conduct of the plaintiff and his son. However, dismissal is a sanction as last resort to be applied only after less dire alternatives have been explored without success, or would obviously prove futile. *Grochal v. Aeration Processes, Inc.*, 797 F.2d 1093, 1098 (D.C.Cir.1986). The sanction of dismissal is reserved for extreme circumstances where deception is willful, in bad faith, or relates to matters in controversy that interfere with the merits of the case. *North Amer. Watch v. Princess Ermine Jewels*, 786 F.2d 1447, 1451 (9th Cir.1986); *Patton v. Aerojet Ordnance Co.*, 765 F.2d 604, 607 (6th Cir.1985). Bearing in mind the policy favoring the disposition of cases on the merits, *Affanato v. Merrill Bros.*, 547 F.2d 138, 140 (1st Cir.1977), the court declines to dismiss this action, finding that alternative sanctions are appropriate.

■ The court finds the appropriate sanction against the plaintiff is to award the defendants the costs, expenses and attorneys' fees incurred as a result of the plaintiff's acquisition and retention of the confidential documents. Rule 37(b)(2) provides in pertinent part:

> In lieu of any of the foregoing orders or in addition thereto, the court shall require the party failing to obey the order or the attorney advising him or both to pay the reasonable expenses, including attorney's fees, caused by the failure, unless the court finds that the failure was substantially justified or that other circumstances make an award of expenses unjust.

The court finds that the plaintiff violated its order of September 15, 1983 regarding the use of these documents, and that he has consistently violated the court's subsequent orders regarding them. Further, the court finds that the plaintiff's disobedience of its orders was in no way justified, or that there exist any circumstances which make an award of expenses unjust.

The plaintiff is ordered to pay the reasonable expenses incurred by the defendants, including attorneys' fees, for all motions, depositions, and other proceedings which have been necessary to resolve the dispute over the confidential documents. Defendants' counsel are directed to file a memorandum within 21 days of the date of this order detailing all expenses incurred since September 15, 1983 as a result of the plaintiff's misconduct. This memorandum shall include itemization of the dates and times for each charge or expense, a description of the activity leading to each charge, the total billable hours expended, total costs expended, and counsels' normal hourly rates. Dr. Kearns, with assistance of his current counsel, shall respond to this memorandum within fourteen (14) days after it is filed.

■ The plaintiff must also bear the cost for the great burden he has placed upon this court by abusing the discovery process. Robert Kearns and his son have gone to great lengths to circumvent the

discovery process. As a result, this court has entertained numerous motions, held an evidentiary hearing, read and researched these motions, briefs and replies. It would be unfair and unwise for such an unnecessary burden to go unnoticed.

Fed.R.Civ.P. 37(b)(2) permits the court to enter "an order treating as a contempt of court the failure to obey any [discovery] orders." The court has held a hearing on this matter, at which the plaintiff and his son were represented by counsel and testified. The court finds that the plaintiff has been in contempt of several court orders, beginning with the one issued on September 15, 1983. This alone is a basis for assessing a fine on the plaintiff for causing substantial and unnecessary burdens to be visited upon the court. *Xaphes v. Merrill Lynch, Pierce, Fenner & Smith*, 102 F.R.D. 545, 552 (D.Me.1984).[6] Courts also have the inherent power to impose sanctions where a party's misconduct has resulted in unnecessary expenditures of time by the court. *Eash v. Riggins Trucking, Inc.*, 757 F.2d 557 (3rd Cir.1985); *Itel Containers Intern. Corp., v. Puerto Rico Marine Mgmt., Inc.*, 108 F.R.D. 96 (D.N.J. 1985); *Olga's Kitchen v. Papo*, 108 F.R.D. 695 (E.D.Mich.1985); *Dominguez v. Figel*, 626 F.Supp. 368 (N.D.Ind.1986); *Anno*, 77 A.L.R.Fed. 789.

An extremely conservative estimate of the time spent by the court on these various matters is 40 hours. This includes time to consider the motions, prepare for them, conduct the evidentiary hearing, and prepare this opinion. Commentators and courts have estimated that one hour spent by a federal judge on a case costs about $600.00. Levin & Colliers, Containing the Cost of Litigation, 37 Rutgers L.Rev. 219, 227 (1985); *Dominguez, supra*. The plaintiff's misconduct has therefore cost the taxpayers at least $24,000. Because the court has some discretion in this matter,

the assessment will be reduced to $10,000. Repetitions of such conduct will not be treated this leniently.

This court hereby orders the plaintiff to pay $10,000 to the Clerk of the U.S. District Court, Eastern District of Michigan, in Detroit, within thirty days of this order as a sanction for his flagrant waste of judicial resources. Failure to make this payment will result in dismissal of plaintiff's action.[7]

## MOTION TO WITHDRAW

Attorneys for Dr. Kearns, Keith V. Rockey and Thomas C. Elliott, Jr., and their firm, McDougall, Hersh and Scott have filed a motion to withdraw from representing Dr. Kearns in this litigation. The plaintiff retained McDougall, Hersh and Scott in April, 1981. During 1983, the plaintiff had some problems with the firm regarding payment of legal fees. Because an apparently amicable resolution of that matter was achieved, Messrs. Rockey and Elliott continued to represent Dr. Kearns.

Counsel states that such serious disagreements between them and plaintiff have occurred that they "have a duty to withdraw since they can no longer represent Kearns' interest." The undisputed facts are replete with instances of disharmony and outright confrontation between Dr. Kearns, his son and counsel. It is evident that the relationship between Dr. Kearns and his attorneys is strained at best. The record shows that on many occasions Dr. Kearns and his son have completely disregarded the advice of counsel and taken their own path.

Both Dr. Kearns and his son, counsel explain, have taken an unrealistic attitude toward settlement of at least one of the suits plaintiff has filed.[8] Mr. Rockey describes Dr. Kearns' attitude as being "recalcitrant" in many instances. *See* Declaration of Keith Rockey, March 9, 1986, at

---

**6.** The decision regarding the merits of this case can be found at 632 F.Supp. 471 (D.Me.1986).

**7.** The *Xaphes* court also assessed a $10,000.00 fine for discovery misconduct.

**8.** Of course, the client has ultimate control over the lawsuit, and may properly refuse even the most reasonable settlement offer. *See Ambrose v. The Detroit Edison Co.*, 65 Mich.App. 484, 237 N.W.2d 520 (1975).

¶ 3–6. In addition, counsel criticizes Kearns "for having in his possession documents that may have been obtained by illegal and improper means." Counsel Reply Brief, at 5. This knowledge of plaintiff's misconduct, counsel asserts, makes further representation impossible.

It is clear that the relationship between Dr. Kearns and his attorneys is in a state of disrepair. Given the nature of the conduct engaged in by plaintiff, the circumstances surrounding it, and the ongoing battle of plaintiff and his son with both Mr. Rockey and Mr. Elliott, the court has no choice but to grant counsel's motion to withdraw.[9]

The granting of counsels' motion to withdraw, however, is not effective immediately. The plaintiff has been ordered to respond to the defendants' statement of costs and fees in connection with sanctions imposed against plaintiff. Because plaintiff's counsel is familiar with the circumstances involved here, it is most prudent to have Messrs. Rockey and Elliott respond to this statement of costs rather than new counsel. Upon resolution of the motion for sanctions against Dr. Kearns, plaintiff's counsel may withdraw.[10]

After the disposition of defendants' motion for sanctions, this matter will be stayed for a period of thirty (30) days. Plaintiff will have this time to retain new counsel.[11] Within this period, new counsel must file a notice of appearance or plaintiff must notify this court in writing that he will be proceeding *pro se*. Failure to do so will result in a dismissal of plaintiff's action.

## CONCLUSION

The defendants' motion to dismiss and/or for sanctions is denied in part, and granted in part. The plaintiff is assessed $10,000 in court costs which must be deposited with the Clerk of this Court within 30 days of this order and must also pay the defendants' fees and expenses incurred as a result of plaintiff's misconduct. This latter amount will be determined pursuant to the briefing schedule set forth earlier in this opinion.[12]

Counsel's motion to withdraw is granted, but does not become effective until disposition of the pending attorneys costs and fees and assessment matter. Thereafter, this matter will be stayed for 30 days. Plaintiff will have this time to retain new counsel. Within this period, new counsel must file a notice of appearance or plaintiff must notify this court in writing that he will be proceeding *pro se*. Failure to do so will result in a dismissal of plaintiff's action.

IT IS SO ORDERED.

---

9. Dr. Kearns has filed a motion he labels as one to create a remedy. What Dr. Kearns seeks is assistance from Messrs. Rockey and Elliott in obtaining replacement counsel. This motion is wholly without merit and is therefore denied.

10. It should not be inferred from this decision that the court condones plaintiff's counsels' conduct with regard to the purloined documents. The court is not satisfied that counsel fulfilled their professional responsibilities. However, this issue was not directly addressed in either the motions or the hearing, leaving the court with insufficient evidence to make a formal finding.

11. Given the past problems plaintiff has had with law firms, he should begin now and proceed as expeditiously as possible in retaining new counsel. Waiting to seek out new counsel until the disposition of the sanctions matter would be highly imprudent.

12. SWF has moved for a preliminary injunction *pendente lite* pursuant to Rule 65, Fed.R.Civ.P. What SWF seeks is to enjoin Dr. Kearns from making "defamatory and disparaging statements about SWF and its products which clearly are outside the permissive reach of a patentee charging enfringement of his patent and constitute acts of unfair infringement. It has been represented to the court that this motion is being withdrawn without prejudice.